

$400

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JACK DOE and NANCY DOE, in
their individual capacities, and as
Parents and Natural Guardians of
DELIA DOE, a Minor,
Lansdowne, Pennsylvania,

    *Plaintiffs,*

    v.

FRIENDS CENTRAL SCHOOL
CORPORATION d/b/a Friends Central
School, MELODY ACINAPURA,
KELLY O'CONNELL BIRD (f/k/a
KELLY BIRD PIERRE) and CRAIG
SELLARS,
1101 City Avenue
Wynnewood, Pennsylvania 19096,

    *Defendants.*

CIVIL ACTION NO. _____

**JURY TRIAL DEMANDED**

FILED

AUG 1 6 2018

KATE BARKMAN, Clerk
By _____ Dep. Clerk

## COMPLAINT

### PRELIMINARY STATEMENT

1. This action is brought under Title III of the Americans with Disabilities Act of 1990, 42
U.S.C. §§ 12181 - 12189 (the "ADA"); Section 1 of the Civil Rights Act of 1866, as amended,
42 U.S.C. § 1981 ("Section 1981"); and Pennsylvania state common law.

2. By this action each of Plaintiffs Jack Doe and Nancy Doe (together, "Parents"), acting
individually on his/her own behalf, and as parents on behalf of Plaintiff Delia Doe, a minor,
seek redress against Defendant Friends Central School Corporation, d/b/a Friends Central
School ("FCS" or the "School"), Melody Acinapura, Kelly O'Connell Bird, f/k/a Kelly Bird
Pierre, and Craig Sellars (each of such persons, an "Individual Defendant"), for their

discrimination against Delia, and exclusion of Delia from the benefits of her education, on the basis of her disability, in violation of the ADA; for their sustained and deliberate campaign of discriminatory treatment, harassment and intimidation against all three Plaintiffs on the basis of their race, in violation of Section 1981; for the School's breach of contract with Parents and breach of the covenant of good faith and fair dealing; and for the Defendants' breaches of fiduciary duty and other torts committed against the Plaintiffs; all as further described in this Complaint.

3.  Plaintiffs seek injunctive relief against Defendant FCS; compensatory and punitive damages from all Defendants for their acts of disability discrimination and race discrimination, as well as for their tortious acts; and compensatory and consequential damages from the School for its breach of contract with Parents. Plaintiffs also seek the recovery of attorneys' fees and costs in accordance with the ADA and 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

4.  Jurisdiction over this action is based on 42 U.S.C. § 12188 and 28 U.S.C. § 1331.

5.  Plaintiffs further invoke the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to adjudicate claims arising under state law.

6.  Venue in this District is proper under 28 U.S.C. § 1391(b), as all of the events giving rise to the Complaint occurred within the territorial limits of the Eastern District of Pennsylvania.

## PARTIES

7.  Each of Plaintiffs Jack Doe and Nancy Doe is an adult individual and a citizen of the Commonwealth of Pennsylvania. Each Parent resides, and at all times relevant to this Complaint has resided, within the Borough of Lansdowne, Delaware County, Pennsylvania.

8.  Plaintiff Delia Doe, born in 2006, is the minor daughter of Plaintiffs Jack Doe and Nancy Doe and a citizen of the Commonwealth of Pennsylvania. Delia resides, and at all times relevant to this Complaint has resided, within the Borough of Lansdowne, Delaware County, Pennsylvania, and within the boundaries of the William Penn School District.

9.  Defendant Friends Central School Corporation is a Pennsylvania non-stock, nonprofit corporation that was incorporated in 1926 by decree of the Montgomery County Court of Common Pleas. The Articles of Incorporation of FCS declared the purpose of the corporation to be "the advancement of learning and the education of youth, and as an incident thereto, the acquisition, maintenance and operation of a school for the education of the young." FCS admitted no religious purpose or affiliation of any kind in its formation documents.

10. FCS operates Friends Central School, a coeducational, college preparatory private school in Montgomery County, Pennsylvania, with its main office located at 1101 City Avenue, Wynnewood, Pennsylvania 19096. The School was founded in 1845 in Philadelphia.

11. The School provides instruction for students from nursery through grade 12. The School encompasses three divisions: the Lower School (nursery through 5th grades), the Middle School (6th through 8th) and the Upper School (9th through 12th). The Middle and Upper Schools share their campus at 1101 City Avenue, Wynnewood, Pennsylvania, and the Lower School occupies its own site at 228 Old Gulph Road, Wynnewood, Pennsylvania.

12. The School purports to embrace certain tenets of the Quaker religion in its educational program, but Defendant FCS is not a religious entity, a religious organization, or an entity controlled by a religious organization.

13. The School does not conduct itself or hold itself out as a religious organization or an entity controlled by a religious organization.

14. The School's admissions policies are intended to be non-discriminatory insofar as religious belief is concerned. Prospective students are not required to be a member of a Quaker meeting, profess Quakerism or accept Quaker principles as authoritative, in order to enroll in or remain at the School.

15. The Philadelphia Yearly Meeting is an association of 103 Quaker meetings in the Philadelphia area and also an independent community organization.

16. The School has an informal and non-compulsory association with the Philadelphia Yearly Meeting. Philadelphia Yearly Meeting describes itself as being in a "care" relationship with a number of Quaker schools, including FCS.

17. Philadelphia Yearly Meeting expressly disclaims any structural or financial control over Defendant FCS or any other school purporting to be a "Friends" school.

18. Delia was not instructed in any Quaker doctrine at the School. She was not expected to regurgitate Quaker principles or teachings as part of her training, and she was never tested on her knowledge of any such teachings or principles. To Delia's best recollection, her teachers did not mention God, the Spirit or religion, not even during Meeting at the School.

19. The School's website speaks of the School's being "guided" by the "philosophy" of Quakerism and having a commitment to diversity "based on Quaker testimony and practice," but the School does not hold itself out publicly as being an organ or instrument of the Society of Friends or as being controlled by the Society of Friends.

20. The operating budget of the School is funded almost entirely from three sources: tuition payments, income on the School's endowment and contributions to the Friends Central Fund from alumni, parents and other supporters.

4

21. Upon information and belief, the School derives no appreciable revenue from its association with any monthly meeting, quarterly meeting or yearly meeting of the Society of Friends.

22. By its own acknowledgment, Defendant FCS neither collects nor maintains data on the religious affiliation of individual donors to the School. Accordingly, FCS cannot identify what, if any, portion of its funding derives from members of the Society of Friends, or the members of any particular meeting.

23. The two campuses of FCS, City Avenue and Old Gulph Road, occupy three parcels of real estate in Montgomery County, Pennsylvania. All three parcels are owned in fee simple by Friends Central School Corporation, in one case under the name "Friends Central School." No other person or entity has any legal or equitable interest, whether absolute, leasehold, contingent, executory or otherwise, in such real property.

24. Upon information and belief, The Board of Trustees of FCS is composed of not more than twenty-five (25) members, with the number to be fixed by the Board from time to time. Upon information and belief, the Board of Trustees currently has twenty-one (21) members, of which not more than ten (10) are required to be members of the Society of Friends. Upon information and belief, not more than eight (8) of the current members of the Board of Trustees are, in fact, practicing members of the Society of Friends.

25. The Quaker meeting closest to the School geographically is the Merion Friends Meeting, in Merion Station, Pennsylvania. Upon information and belief, not one of the current Trustees of FCS is a regular member of the Merion Friends Meeting.

26. The board or other governing body of the Merion Friends Meeting does not exercise any management, operational or financial control over the School or the Board of Trustees of FCS.

27. Neither the board or other governing body of the Merion Friends Meeting, nor any share of the membership of the Merion Friends Meeting nominates, selects or appoints any Trustee or other officer of the School.

28. Upon information and belief, Defendant Sellars, in his capacity as Head of School, nominates candidates to fill any vacant seats on the FCS Board of Trustees. Upon information and belief, Defendant Sellars holds no official title or formal office within the Society of Friends or any meeting of the Society of Friends.

29. The Society of Friends encourages the establishment of private schools "in the Quaker tradition" by persons who may or may not have any background or training in Quaker principles or practice. The Friends Council on Education, which is headquartered in Philadelphia, publishes *The New Friends School Kit: Guidance For Starting a Friends School,* a compendium of resources intended to help the neophyte establish and program for a "Quaker school." The School Kit includes a guide to the faith and practice of Quakerism and a governance handbook providing instruction on implementing governance arrangements for a Quaker school that will minimize governmental regulation and oversight over a Quaker school.

## STATEMENT OF FACTS

30. Plaintiff Delia Doe is an 11-year-old child who has been enrolled at FCS since kindergarten, which she began in September 2012. Delia recently completed her fifth-grade year at the School.

31. Delia Doe and Parents are African-Americans. Delia was one of only three (3) African-American children in the fifth grade class, accounting for approximately 10% of that class, at the end of the 2017-18 school year. Upon information and belief, African-Americans make up less than 10% of the student body at the School overall.

6

32. At all times relevant to this Complaint, Delia Doe has suffered from Attention Deficit Hyperactivity Disorder (ADHD). Delia was first diagnosed with ADHD in November 2015.

33. Delia showed signs from early in her schooling of having problems with sustained attention, organization and focus/staying on task.

34. In November 2015, when Delia was in the third grade at the School, she was evaluated by the Montgomery County Intermediate Unit (MCIU), the state regional education service agency that provides instructional and other services to school districts in Montgomery County, for a possible impairment or condition affecting her ability to learn or to enjoy the benefits of her educational program.

35. Melinda Hunt, a Certified School Psychologist for the MCIU, conducted the evaluation and produced a Psychological Report, dated November 23, 2015 (the "Hunt Report"). The Hunt Report contains a diagnosis of ADHD (Predominantly *Inattentive* Type), with a recommendation to pursue further clinical investigation of ADHD (Predominantly *Hyperactive-Impulsive* Type).

36. Delia's full-scale I.Q. score on the Wechsler Intelligence Scale for Children, as reported by the Hunt Report, was within the Average range, at the 61st percentile. Delia's lowest scores on the Academic Achievement Tests came in Mathematics. Her Wechsler Individual Achievement Test (Mathematics) scores were at the 34th and 13th percentiles.

37. The Hunt Report noted that, behaviorally, Delia is prone to be impulsive in her decisions and actions:

- "[T]here are times when she misreads social situations and acts impulsively, and then does not assume responsibility for her actions."

- "Close monitoring is especially important in situations that tend to trigger impulsive/defiant behavior."

7

- "She is very socially motivated, yet is impulsive and when she doesn't get her way will say and do things that are not kind."

38. The Hunt Report also noted that Delia had significant difficulties reading social cues and conforming her behavior, resulting in conflict with her peers and sometimes hurt feelings:

- "[S]he experienced frequent disagreements in her relationships and struggled to find her part in the dispute."

- "The kids in my class are very kind and will put up with her but no one seeks her out and she will be alone sometimes at recess."

- "It seems like there are a lot of games that she plays and kids get tired of that."

- "She doesn't know how to talk to kids and can be very literal which bothers them."

39. The Hunt Report also notes that Delia had been receiving math remediation services from the MCIU since the first grade.

40. Purportedly based, in part, on the Hunt Report, the School created an "Educational Plan" for Delia in November 2017. A true and complete copy (subject to redactions) of the Educational Plan, which was only recently produced to Parents by the School, is attached to this Complaint as "Attachment A."

41. The same Educational Plan was renewed for Delia for the 2016-17 school year on August 25, 2016.

42. Neither of the Parents had seen the Educational Plan until it was produced by FCS in connection with a request for Delia Doe's school records earlier this year. Parents were never asked for their input into the Educational Plan or asked to review it once drafted.

43. The Educational Plan noted that, since first grade, Delia had been receiving remedial math instruction from MCIU twice per week, in a small setting.

44. The Educational Plan recommended one *Accommodation,* the "Option to test in a small group setting with minimal distractions," and no less than 21 *Classroom Supports*, that should be instituted for Delia at school. These Classroom Supports, which have been annotated with red numerals in Attachment A, included, *inter alia*, (#2) Use of visual organizers, graphics and tactiles for new concepts, (#9) Movement breaks during long seated lessons (brain breaks) and (#16) Predetermined hand signal[s] or verbal cue[s] to address "off task or impulsive behavior."

45. The Educational Plan indicates that the person or persons who authored or revised it sought and received recommendations from Lori Romano, M.D., a Pediatric Psychologist at Nemours du Pont Pediatrics who is Delia's private psychologist, on February 9, 2017 and December 4, 2017. Some or all of Dr. Romano's recommendations appear to have been included in the Plan.

46. The suggested *Accommodation* of allowing Delia the option to test in a small group setting was never offered to Delia until the last six months of her fifth-grade year, when it was offered as an alternative to the fifth33errf-graders generally on one or more tests.

47. Of the 21 *Classroom Supports* recommended in the Educational Plan, fifteen (15) were never provided or offered to Delia by the School, and the other six (6) were provided or offered to her, but only sporadically or inconsistently. The 15 Classroom Supports that were never provided to Delia Doe are those numbered 1- 6, 8, 9, 11 - 14, 16, 18 and 20 in Attachment A.

48. Delia's academic report for the First Semester of the 2017-18 school year shows average to better-than-average performance in most areas of study. In each subject except math, Delia's ratings over a range of variables were uniformly "Meets Expectations" or "Exceeds

Expectations." In mathematics, however, Delia was rated generally as having "Developing Skills" or "Support Required."

49. The comments of Delia's Health teacher, Beth Tedesco, in Delia's First Semester 2017-18 report card, reproduced here, are fairly representative of the other teachers' comments:

> [Delia] is an enthusiastic member of the class. She seemed to have a sincere interest and strong understanding of the material we are covered in health this fall. I appreciate [Delia] consistently sharing her insightful comments during our class discussions, but encourage her to remember not to call out her thoughts. Recently, I have seen some improvement in this area. I encourage [Delia] to keep up the good work!

50. Despite Delia Doe's difficulties focusing and her impulsivity, until October 2017, Delia had never been subject to formal disciplinary measures at the School.

51. Delia Doe has been the victim of bullying at the School at least since the second grade. A significant part of the bullying was marked by racial hostility.

52. The incidents of verbal and physical harassment experienced by Delia included the following:

53. In February 2015, the school nurse reported that Delia was "accidentally bumped" on her cheek under the right eye "by an elbow." The school nurse gave Delia ice for the swelling. The identity of the perpetrator is unknown to Parents.

54. In March 2015, the school nurse reported that another student "moved [Delia's] chair and she lost her balance." She had injuries to her lower lip and her right eye. The identity of the perpetrator is unknown to Parents.

55. In third grade, another student called Delia a "nigger."

56. In May 2016, the Asst. Principal of the Lower School informed Nancy Doe that a third-grade boy had taken an improvised football, made of newspaper and tape, and shoved it directly

between Delia's legs. Delia required a hospital visit in connection with this incident, and her vagina was red and sore for over a week. The School reported to Mrs. Doe that the boy's actions were not deliberate. Mrs. Doe believes that it was a deliberate act, because the boy never let the ball leave his possession after striking Delia Doe.

57. In fourth grade (2016-17), Delia's chief tormentor was a fellow female classmate, referred to herein as "Melissa." On separate occasions, Melissa stabbed Delia with a pencil, threw her off the monkey bars and threatened physical violence should Delia report her abuse to teachers.

58. On October 19, 2016, while occupying a restroom stall next to Delia's, Melissa reached under the stall divider, grabbed Delia's shoe and tried to flush it down the toilet with waste. The shoe did not flush out of the toilet, so Delia recovered it, and wore a shoe soaked in urine (and possibly other waste matter) for the remainder of the school day. Although certain FCS staff members, including Delia's teacher, knew about the shoe incident on the day it occurred, nothing about it was mentioned to Nancy or Jack Doe. After hearing of the incident from Delia, however, Nancy Doe brought it to Principal Bird's attention the following day, and there was a reckoning of sorts about the incident. Melissa admitted what she had done.

59. In an email to Nancy Doe, dated October 20, 2016, Principal Bird recapped what FCS staff had done in response to or remediation of the shoe incident. A true and complete copy of that email (subject to redactions) is attached to this Complaint as "Attachment B". Principal Bird's response is a case study in FCS's process of re-branding or "spinning" an historical event to evince the message or moral that the institution wants to promote and to obscure those elements of the event that do not comport with FCS's chosen narrative. The email opens with the Principal's "regret" over "what happened to [Delia]," although what happened to Delia is

11

never actually described or even named in the email. In the remainder of the email, a reader would have difficulty identifying which child was the perpetrator and which was the victim of the suspect "behavior."

60. According to Principal Bird's email, she, Counselor Jessica Corsaro and the teachers of the two girls had already formulated a "plan" with the following objectives: (1) "to address the behavior that occurred," (2) "to support and check in on [Delia]," and (3) "to alert specialist teachers about the behavior so they can keep an eye out." There is no mention of addressing *Melissa's* behavior in particular, or the causes of such behavior. In fact, **Melissa's name is mentioned nowhere in the email** – like an unindicted co-conspirator in a criminal indictment. Furthermore, under the plan developed by the four FCS educators, it seems that Delia would be getting the greater part of the professional attention.

61. Most of the aforementioned incidents (¶¶ 53-58) were reported to staff of the School. For each reported incident, the School's conclusion, as reported to Mr. and Mrs. Doe, was that the behavior of the perpetrator was accidental, or his or her culpability was no more than Delia's own.

62. Upon information and belief, the School never imposed any disciplinary sanction – not even a reprimand -- on any of the perpetrators of the aforementioned acts of verbal and physical violence. The historical lack of disciplinary repercussions in connection with these incidents stands in stark contrast to the punitive juggernaut that the Defendants unleashed on Delia Doe for her relatively benign acts of October 16, 2017, described further, *infra*, at ¶¶ 82-90, 126-30, which included a custom-made disciplinary regime (the so-called Education Plan); "solitary" treatment at lunch and on other occasions; a request to search Delia for weapons; and a

determination that Delia could not advance to the Middle School. This difference in treatment is the result of, and was motivated by, racial bias and greed.

63. On October 16, 2017, Delia's fifth-grade class took a field trip to Green Meadow Farm, under the supervision of teachers Brandi Lawrence, Tina Lee and Tiffany Borsch.

64. Preparing to board the bus to the Farm, Delia and some of the other children were discussing their plans for seating arrangements on the bus trip. Eager to be seated next to her friend, a student who will be referred to herein as "Toby," Delia engaged in a flight of fancy about what she might do to get that seat she wanted next to Toby. Delia became very dramatic in describing the absurd lengths to which she would go to beat the competition, which purportedly included "gouging out" the eyes of other students and other horrors.

65. Besides Delia, no student or staff member at FCS suffered any injury, or any lasting effects of any sort, as a result of the dramatic scene presented by Delia on October 18, 2017.

66. The following day, October 19, 2017, Defendant Kelly O'Connell Bird, who was not present at the time of the incident, recounted her version of the event in an email to Parents:

> In looking for partners for the bus trip, [Delia] asked a classmate to be her partner. He said he already had a partner and, according to 4 students who were asked separately, [Delia] then said, "What if I kill [your partner] then he won't be able to sit with you. What if I kill everyone in the class?" Later a classmate asked her while at the farm, "Why did you say you would kill everyone?" [Delia] quickly hugged the classmate and said[,] "I wouldn't kill you, but I would kill [and pointed to another classmate]." She then described how she would kill him by gouging out his eyes and cutting his head off.

67. Even assuming that Principal Bird's account of the dialogue that day is accurate, the words used by Delia were plainly those of an impulsive, games-playing child who is engaging in a "what if" fantasy meant to capture the attention of her audience.

68. Principal Bird launched a purported "investigation" into the incident of October 16. From the very beginning, this investigation, conducted by Ms. Bird herself and Defendant Melody

Acinapura, Assistant Principal of the Lower School, betrayed an ulterior agenda – one having nothing to do with obtaining an accurate record of, or remediating, the incident. Principal Bird observed:

> During our conversations with the students, we heard about several **other incidents** in which people felt insulted by [Delia] and felt like she had said things that **made them feel unsafe**.

K. Bird email to N. Doe and J. Doe, October 19, 2017 (emphasis added). Upon information and belief, Principal Bird's email report was completed and disseminated *after* she had already heard from angry and anxious parents demanding adverse consequences for Delia Doe.

69. The School's purported investigation of the incident of October 16, 2017 was exploited by the administration as an opportunity to collect negative reports about Delia's past behaviors having nothing whatever to do with the events of October 16.

70. Immediately after the field trip incident, Principal Bird and the Assistant Head of School, Mariama Richards, asked that Delia "take a break from school" over the weekend. Principal Bird informed Parents, cryptically, that "the situation has reached a threshold." Principal Bird also indicated to Parents that, in order for Delia to return to FCS, "she must have the support of a therapist in place."

71. Parents took Delia to Dr. Romano for a medical/psychological assessment of whether Delia represented any threat to herself or to the school community. On October 20, 2017, Dr. Romano determined that Delia did not represent such a safety risk, and she was cleared to return to school. That same day, Defendants Bird and Acinapura spoke with Dr. Romano by telephone and were apparently satisfied with her assessment, as Principal Bird reported to Mrs. Doe that the Principal and Asst. Principal Acinapura

> left the call feeling like you and [Delia] are in wonderful hands. [Dr. Romano] was
> knowledgeable, really seemed to have a good understanding of who [Delia] is and
> had some very helpful strategies to share with us for [Delia's] return to school on
> Monday.

Email K. Bird to N. Doe, October 20, 2017.

72. On October 23, 2017, at the request of Principal Bird, Nancy Doe gave Dr. Romano

written permission to speak freely with FCS about any matters concerning Delia's condition and

treatment. Dr. Romano's written assessment, clearing Delia for return to school, was delivered

to FCS on October 30, 2017. That assessment should have ended any debate about whether

Delia should be excluded from the FCS community, but it did not.

73. Reports of the events of the October 16 field trip, with varying degrees of veracity,

quickly reached the ears of parents of the Lower School's fifth graders. The anxiety and

suspicions of some of those parents coalesced, in the matter of a few days, into a significant

movement to punish the perceived wrongdoer, Delia Doe, and to exile her from the accepted

FCS community.

74. The parents of at least six fifth-graders spearheaded the campaign to banish Delia Doe

from the FCS community. Among the most vocal of these parents were Eric K. and Meena T.,

the parents of A.K., who are hereinafter referred to as "Mr. and Mrs. K."

75. By Sunday, October 22, 2017, barely six days after the incident on the field trip, Mrs, K.

wrote a lengthy email to Principal Bird in which she complained of devastating effects of

Delia's "threats to violently kill three boys in the class as well as to kill the class as a whole."

Mrs. K declared that her daughter A.K. and other children in the class "are frightened for their

safety." True and complete copies (but for identified redactions) of this and some of the other

email correspondence between Mr. and Mrs. K and FCS administrators are attached to this

Complaint as "Attachment C."

76. Upon information and belief, the emails included in Attachment C were simultaneously copied to most of the parents of the fifth-grade students in the Lower School.

77. Without any facts to support her specious claim that Delia Doe was an imminent threat to the safety of the FCS community, Mrs. K launched a vicious, public attack on the 10-year old girl:

> [Delia] is a very disturbed child and obviously needs a formal psychiatric evaluation. She has repeatedly inflicted injuries upon herself and blamed others for them, and threatens to do this constantly. She tried to strangle a classmate a few years ago. Her actions this year are unacceptable. ...**I do not think this child should be attending FCS.**

Att. C, p. 4 (Mrs. K email to K. Bird (Pierre), October 24, 2017) (emphasis added).

78. Into three sentences Mrs. K managed to pack four falsehoods about Delia Doe: that she is a ***disturbed child who requires psychiatric evaluation***; that she ***repeatedly inflicts injuries on herself*** and constantly threatens to do so; that she ***blames others*** for these self-inflicted injuries; and that she ***tried to strangle a classmate*** at FCS. Worse still, for its eventual impact on Delia Doe's status at FCS, is that Mrs. K disseminated her salacious message electronically to most of the fifth-grade parents at FCS, thereby infecting at least some of them with her poisonous invective.

79. Mrs. K's fusillade of attacks did not end with the aforementioned libels. She also engaged in race baiting. In the same email, she asked Principal Bird the question "Does she [Delia] have access to guns or other weapons at home?" *Id.* That charge, simultaneously transmitted to 30 or more parents of fifth graders, was consciously intended to incite fear based on the Does' skin color – in particular, an insidious presumption that, as African-Americans, the Does were not only more likely to possess dangerous weapons, but more likely to allow their children to wield them.

80. On October 24, 2017, Principal Bird emailed Nancy Doe to say that Mariama Richards, [Asst. Head of School for Diversity], Melody Acinapura [Assistant Principal] and Ms. Bird wanted to meet with Mrs. Doe the following day "in order to ensure open lines of communication." Mrs. Doe expected that the subjects of the meeting would be Delia's mental and emotional condition since the incidents of October 16, and what supports might be needed for Delia in the school setting. The actual discussion at the meeting on October 25, as led by Principal Bird, however, focused on the "concerns" that Principal Bird and the other administrators now had about Delia's capacity to succeed at the first year of Middle School beginning in Fall 2018, with particular emphasis on Delia's social life and interaction with peers.

81. At the meeting on October 25, 2017, Principal Bird, Asst. Principal Acinapura and Ms. Richards expressed the view that, because of the incident of October 16, and the School community's reactions to it, Delia would very likely begin her Middle School years – a critical period of social growth – at a significant disadvantage. At this meeting, however, none of the administrators stated that FCS would not promote Delia into the Middle School, or that Delia was not prepared academically or .

82. Mrs. K's hateful and vulgar attacks had other significant impacts on the Does almost immediately. By October 30, 2018, Principal Bird and other member(s) of FCS staff had drawn up a document styled as a "Behavior Plan" for Delia. Principal Bird emailed Parents on the evening of October 30, 2017 about sharing the "revised plan" with Parents at a meeting to be scheduled.

83. The so-called Behavior Plan, a true and complete copy of which (subject to redactions) is attached to this Complaint as "Attachment D," is not at all like a behavior plan typically

employed in a modern education context, which is generally known as a "Behavior Intervention Plan" or "BIP." For children receiving special education services in public and other schools subject to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, Congress required that behavioral intervention plans emphasize positive supports:

> Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by— ...providing incentives for whole-school approaches, scientifically based early reading programs, *positive behavioral interventions and supports,* and early intervening services to reduce the need to label children as disabled in order to address the learning and behavioral needs of such children.

20 U.S.C. § 1400(c)(5)(F) (emphasis added). In contrast, the plan imposed on Delia Doe was more like a code of conduct or probation agreement, specifying penalties for various levels of disciplinary infraction.

84. In the upper left-hand corner of the Behavior Plan document is the header "Revised 10/30/17," which suggests that some version of the Behavior Plan had existed before. Parents presume that the "revised" Behavior Plan merely followed the original by a few days, as they had never seen any earlier version of this Behavior Plan nor were ever informed that any prior Behavior Plan was in effect.

85. Nancy Doe was deeply upset by the establishment of the Behavior Plan, as it was not based on a model that applied generally at FCS, but rather was designed solely for Delia. Mrs. Doe reported at the time that she believed "it was designed *with the goal* for [Delia] to fail." The inevitable effect of the Behavior Plan, in Mrs. Doe's view, was to establish a tripwire for Delia's expulsion, making it a near certainty.

86. On October 31, 2017—the same day that the Behavior Plan was presented to parents-- Mrs. Doe learned, in a telephone conversation with Dr. Romano, Delia's therapist, that Principal

Bird had actually called Dr. Romano on that day to ask her **if Delia could be searched for weapons** when entering the School grounds.

87. Upon information and belief, no parent of an FCS student had ever openly raised the question of weapons possession by a student, or weapons ownership in a student's home, in connection any other incident of actual or purported threats of violence involving a *white* FCS student in all of the years that Delia Doe had been a student there.

88. Principal Bird's pursuit of stop-and-frisk authority from Dr. Romano was not the last time that the venal objectives of Mrs. K, or other influential parents of FCS students, with regard to Delia Doe would be enthusiastically pursued by FCS administrators. *See* ¶¶ 125-31, *infra*.

89. In the weeks after putting the Behavior Plan in place, Asst. Principal Melody Acinapura told Nancy Doe that Delia was "walking on eggshells" and warned Mrs. Doe that "she [Delia] couldn't even get another 'Level One,'" referring to the lowest category of sanction for a behavioral misstep in the Behavior Plan.

90. From that point through the remainder of the 2017-18 school year, most of the conversations that Nancy Doe had with Principal Bird and others at FCS have had one theme, and it was explicit: the absolute imperative that Delia withdraw from FCS, or be expelled, at the soonest possible time.

91. All the while that the Defendants were establishing new disciplinary hoops for Delia Doe to jump through, couples and groups of fifth-grade parents were making in-person visits to Head of School Craig Sellars, Principal Bird and other FCS staff, in each case to seek assurances that the School would isolate the allegedly violent and homicidal, would-be terrorist among the fifth graders– Delia Doe–and, ultimately, drive her from the FCS family for good.

92. Principal Bird and other staff (including Defendant Acinapura) were frank with Mrs. Doe, at times, about the intense pressure they and the School were under from parents to find — or, more accurately, force — a "solution" to the perceived problem of Delia Doe. Mrs. Doe protested vehemently that it was the School's responsibility to speak reason to the agitated parents, not to turn on the victim and toss Delia aside with last year's textbooks.

93. At an in-person meeting with Principal Bird on November 1, 2017, Nancy Doe expressed her and her husband's anxieties and fears concerning the hostility of the fifth-grade parents and their campaign against the Does. Principal Bird reassured the Does that the School considered the parents' behavior in this regard inappropriate.

94. The day after the meeting, Nancy Doe sent the following email to the Principal:

> Good evening, Kelly,
>
> I want to thank you for our meeting yesterday to address my concerns surrounding parents' hostility, demands and overall safety of [Delia]. Although **I am still concerned I am glad to know you agreed that the parents' behavior has been inappropriate at Friends**. [Jack] and I are hoping these behaviors change from the parent community. Looking forward to the parent-teacher conference tomorrow.

E-mail from N. Doe to K. Bird (Pierre), November 2, 2017 (emphasis added).

95. In early November 2017, the parents of FCS fifth graders (not including Jack and Nancy Doe) held a meeting in the home of one parent couple, billed as a start-of-year "welcome" meeting, in part to discuss what to do about the continued presence of the putative would-be terrorist, Delia Doe, among the fifth graders. At that meeting, upon information and belief, many of the participants complained that the School was not talking aggressive enough measures to force Delia out of the School.

96. Upon information and belief, the unusual agitation and desperation of many of the fifth-grade parents with regard to Delia Doe and the threat she allegedly represented were

driven, in significant part, by salacious reports relating to the background of her father, Jack Doe, that had previously been circulated among many of the parents.

97.     During Delia's second-grade year at FCS, the mother of another second-grader, referred to herein by the fictitious name "Susan Smith," discovered that the father of yet another second-grader, hereinafter referred to as "Robert Roe," had a criminal conviction in his background. Susan Smith is a white female; Robert Roe is an African-American male.

98.     Upon information and belief, Ms. Smith hired a private investigator to investigate, initially, the background of Robert Roe and, later, the background of parents of each African-American child in the second grade. Jack Doe was one of the subjects investigated. Susan Smith discovered that Mr. Doe had at least one conviction, by then more than ten years old, for a minor, non-violent offense. Jack Doe had never served any term of incarceration for that or any other criminal offense.

99.     Upon information and belief, Ms. Smith embarked on a campaign to discredit those FCS students' families she deemed to have a checkered past -- all of them African-American families, including the Does -- and to stigmatize their children as being tainted, or defective, on that account. Although at the time there was more than one white FCS parent who had a serious criminal offense in his background, Susan Smith's effort did not target any white fathers or families.

100.     Susan Smith asked the School to impose a ban – a prohibition on entering the School's grounds – on any parent or other relative of a student who had been convicted of any of a long list of crimes, including offenses having nothing at all to do with the safety of children.

101.    Susan Smith actively tried to rally other FCS parents to her cause against the "tainted" African-American families, and her trove of investigative data, including the identities of its targets and the allegations against them, was well known to the FCS administration and among the parents of the FCS second-graders.

102.    Susan Smith ultimately withdrew her child from FCS before the start of her third-grade year.

103.    One unfortunate effect of all of the idle fear-mongering, from Susan Smith's investigation of black criminality and its supposed threat to the FCS community, to Mrs. K's rantings about the "disturbed" and violent mind of Delia Doe, was to encourage the notion -- a dangerous, reactionary notion -- that the enemies of safety could be identified by their racial or ethnic backgrounds.

104.    If FCS staff did do anything to tamp down the irrational fears of the mob, it was not apparent to the Does or to many other FCS parents. The pressure on all of the Does only increased from the end of October 2017.

105.    Emails Nancy Doe received from Principal  Bird and other teachers/administrators at FCS in the last two months of 2017 were generally marked by a superficial air of concern and desire to be helpful. These communications had a notable common refrain:

- "I wanted to see if [Delia] is seeing anyone to address her attention challenges yet. The teachers are eager to partner with that person and use any strategies that they suggest." [Email from K. Bird to N. Doe, Nov. 28, 2017.]

- "I think we need to. . . see how we can further partner with [Delia's] outside support providers." [Email from K. Bird to N. Doe, Nov. 29, 2017.]

106.     Principal Bird and others at FCS made no secret of the fact that they strongly favored placing Delia on ADHD medication. Various FCS staff members suggested medication on at least five occasions in Delia's fifth-grade year alone. Despite the continual posturing about "partnering," however, Defendants Acinapura and Pierre and other School administrators and teachers did little or nothing to suggest or help implement non-pharmaceutical strategies for addressing Delia Doe's neurological difference, such as the recommendations for classroom supports contained in Delia Doe's Educational Plan. Att. A, pp. 1-2. There is scant, if any, evidence of FCS staff's "partnering" with Dr. Romano, or anyone else, for the advancement of Delia's welfare or improvement in her access to an education.

107.     The overt concerns in the Individual Defendants' emails were not matched, moreover, by the rhetoric they used with Nancy Doe in person. At some time in the first three weeks following the October 16, 2017 incident, when Mrs. Doe, under intense pressure to withdraw Delia from the School, told Principal Bird that she (mother) would never voluntarily withdraw Delia from FCS in the middle of a school year, Principal Bird exclaimed that "She [Delia] won't *make it* until the end of the year!"

108.     In late October 2017, Principal Bird suggested to Mrs. Doe that it would be wise to remove Delia from FCS "immediately," while Mrs. Doe could still collect favorable letters of recommendations from Delia's teachers that would be useful in applying to other schools. Implicit in this suggestion, and alarmingly apparent to Nancy Doe, was a threat that, if the Does did not take prompt action to transfer Delia to another school, favorable recommendations might not be forthcoming.

109.     One day at the School in November 2017, Asst. Principal Acinapura asked Delia how she was doing and, when Delia responded that things were "O.K.," Ms. Acinapura

responded excitedly, "How can you *possibly* be O.K. with everything that's going on?" At about the same time, Ms. Acinapura also told Nancy Doe that Delia was "walking on eggshells" and could not survive even a "Level One" disciplinary infraction.

110.     Amidst all of the frenzy pointed toward expulsion, facts and rational debate took a vacation. There was no sensible discussion among parents and School personnel of how or why Delia Doe should now be considered a liability at FCS or, worse yet, an imminent threat to safety. The Defendants offered no thoughtful proposals for additional supports or services at school that might help Delia to improve her focus or social skills, or ease her feelings of alienation.

111.     Ramping up the hysteria among the 5th grade parents was the ongoing colloquy between Mr. & Mrs. K and Defendant Kelly Bird about the anti-terrorism measures that should be instituted to ensure the safety of the FCS Lower School. In an email to Principal Bird on October 23, 2017, Mrs. K instructed Principal Bird on one set of protective measures that had purportedly been agreed to:

> Per our discussion today, we have informed Anna that she will never be seated next to [Delia] (either in a classroom, meeting for worship, or during any type of transport), will never be alone with her without supervision by an adult, and will never be required to do a group project or exercise with her in any classroom setting. I just want to make sure Tina and Brandi are aware of the details of our discussion.

Att. C, p. 2.

112.     Shortly after that exchange, the School implemented new restrictive measures for Delia, not justified by any evidence, that served further to isolate her from her classmates. Beginning in early November 2017, FCS administration imposed on Delia new rules for Delia's physical movement on campus. Delia was forced to walk at the head of any line of students, in order that she could be closely monitored. At recess, Delia was required to have a teacher

24

supervise her at all times. Delia was also required to spend her lunch period with the School

counselor, Jennifer Corsaro, who most often took Delia to the counselor's office to eat lunch.

113.    The new restrictions offered little or no educational or therapeutic benefit to Delia

and they were not intended to. The Defendants *intended* them to be seen (by parents, first and

foremost) as safeguards for the benefit of the other students who might be harmed by Delia

Doe. Their principal effect, however, was to further isolate Delia from her classmates and set

her apart as a "dangerous" threat.

114.    During the years that Delia Doe was enrolled in FCS, there were a number of

instances, known to Delia and other students, where a white student threatened verbally to

"blow up the school" or "mow down Ms. [Teacher]" or otherwise inflict violence and terror on

the School. Upon information and belief, in *none* of those instances did the FCS staff establish

for the white perpetrator a tailor-made Behavior Plan of tighter discipline (*see ¶¶ 82-86, supra*),

or implement isolation strategies like those applied to Delia Doe beginning in November 2017.

115.    Delia was keenly aware of the unusual, negative attention focused on her by FCS

staff, teachers and students in the weeks and months after October 16, 2017. She knew, from

discussions at home and comments made by classmates, that the parents of the fifth graders–

most of whom she had known since kindergarten -- were mostly aligned against her. Delia

witnessed the intense pressure her Parents were under to remove her from FCS. As Fall 2017

wore on, the little girl who was always excited about the learning and social opportunities that

school represented became acutely school-phobic. The anxiety became so severe on certain days

that Nancy Doe could not send Delia to school. On November 26, 2017, Mrs. Doe reported:

> [Delia] is displaying anxiety with the thought of having to go to school tomorrow... She
> was seen at NHS [Northwestern Human Services] on Friday for her anxiety and they
> recommend outpatient therapy. I am currently setting her sessions up.

N. Doe email to Unnamed Friend, November 26, 2017.

116.     Delia Doe's anxiety level rose sharply during November 2017 as a result of the negative attention that was given to her and her remarks of October 16, by the Defendants and by the FCS community generally. Nancy Doe reported on Delia's mental state on November 28, 2017, in an email to Principal Bird:

> [Delia] has been suffering from "school phobia" with everything that has been going on. She knows about the inappropriate behaviors from the Friends' parent community and them wanting her to be searched. She has developed anxiety from being treated differently with all the new restrictions. "The stage" you spoke about her being on and everyone watching has taken a toll on her. Having to be perfect and walking on eggshells she feels it all. None of her peers has gone through or has to go through what she's enduring. She has been seeking help to deal with everything and getting counseling. Thank you for your concerns.

117.     On or about November 30, 2017, Principal Kelly Bird told Nancy Doe plainly, for the first time, that it would not be advisable for Delia to move on to the Middle School for the 2018-19 school year, ostensibly because Delia, hampered by her executive functioning and organizational deficits, could not possibly handle the demands of a six-course schedule at the Middle School. Interestingly, this supposed barrier to Delia's advancement to the Middle School was never raised with the Does prior to October 16, 2018. This concern had also been no barrier to FCS's giving favorable letters of recommendation for Delia to attend other private middle schools.

118.     Upon information and belief, during the time that Delia Doe was enrolled in FCS, FCS had never denied a fifth-grade student promotion to the Middle School on account of concerns about his or her organization and executive functioning skills. If FCS's determination to terminate Delia Doe as an FCS student at the end of the 2017-18 school year was genuinely driven by Defendant Bird's and Defendant Acinapura's grave concerns about Delia Doe's capacity for organization and executive functioning *at the level required for sixth grade*, then

26

the Defendants' earlier campaign to drive Delia out of the School *in the middle of her fifth-grade year* – as soon as possible – becomes difficult to explain.

119.     A cursory reading of Delia's Psychological Report from 2015 would supply the reader with a fairly straightforward explanation for Delia's inappropriate declarations of October 16, 2017 -- about "killing" classmates who might get in the way of her desired bus partner: her impulsiveness and social awkwardness. In the face of such a connection, a school psychologist or certified behavior analyst might reasonably be expected to develop some new or additional strategies for managing Delia's impulses and lack of self-awareness in social situations. Instead, the Behavior Plan improvised by Asst. Principal Acinapura and adopted by FCS in the weeks after the farm incident merely tightened the triggers for disciplinary repercussions against Delia, without establishing any strategy for ameliorating undesirable behaviors.

120.     Defendants FCS, Bird and Sellars largely abdicated their role as the mediators among differing interests at the School and, insofar as Delia Doe was concerned, ceded control over Delia' education and general experience at the School to the fifth-grade parents and, in particular, to those parents who were significant contributors to the FSC fisc. Principal Bird's email to Meena T. on October 23, 2017 (which was circulated to other parents) assured the parents that the FCS administration "did not take the events from last week [the events of the farm field trip] lightly," and assured the parents that "we have a proactive and specific plan which was shared with the teachers and family this morning." Att. C, p. 3. The "plan" was a plan to isolate and manage a purported risk – Delia Doe herself.

121.    At a meeting between the Does and FCS administrators on December 5, 2017, Principal Bird told Mrs. Doe definitively that Delia would not be offered a contract for matriculation at the FCS Middle School for the 2018-19 school year.

122.    FCS publicly proclaims to be a school devoted to the principle that there is a "divine spark" in everyone, one that seeks to empower "all traditionally marginalized groups." Such an institution could reasonably be expected to expend some effort to help a promising student overcome behavioral challenges arising from a modest neurological difference like ADHD. In Delia's case, however, the School's approach was to show her the exit door.

123.    On January 16, 2018, Delia returned home from school and recounted for Nancy Doe an incident she had witnessed there. Delia reported that two white, male classmates, who will be referred to herein as "Chad" and "Chuck," were play-acting a shoot-out s between the two of them, using simulated weapons, in full view of their teacher, Tina Lee. After approximately five minutes of this "shooting" scene, Chuck shouted to Chad "You can't shoot me, I'm already dead!" The shooting continued nevertheless. Chuck continued to shout "Stop shooting me! I'm already dead and you're not allowed to keep shooting!" as Chad did exactly that. Delia told her mother that this incident made her very upset as she watched, because the boys were using words very like the words that "got [her] into so much trouble."

124.    Upon information and belief, there were no disciplinary measures taken by the School against Chad or Chuck, and there were no other adverse consequences suffered by either of them, in connection with their shooting play and threats of shooting.

125.    On that same day in January, Delia reported to Nancy Doe that she asked a classmate, "Laura," to play with her, and Laura declined. Laura's exact words, according to

Delia, were "People are parting ways with you because of what you said." It was apparent that children and adults in the FCS community had been telling Laura to stay away from Delia.

126.     On March 23, 2018, Nancy Doe received an email from Principal Bird that announced, for the first time, that FCS planned to provide Delia Doe with a one-on-one personal aide who would shadow Delia in the classroom on a full-time basis. A true and complete copy of this email (subject to redactions) is attached to this Complaint as "Attachment E."

127.     Principal Bird informed Mrs. Doe that the one-on-one aide would start "after the [Spring] break," or the school day next succeeding the date of the email. A conservative institution like FCS, known for its careful planning and staging of events and change, was here proposing drastically to change Delia Doe's educational experience practically overnight, without ever having discussed with Parents the necessity of a one-on-one aide; the role that he or she would play in the classroom; his or her qualifications for such position; whether there should be a transitional or phase-in period; or any number of other aspects of such a plan in which a parent would naturally have a keen interest.

128.     Jack and Nancy Doe were dumbfounded by Principal Bird's surprise announcement. What was notable to the Does about FCS's plan, besides its apparent urgency, was that it was presented with no convincing justification to support it. Principal Bird's explanation for the introduction of a one-on-one aide was as follows:

> Based on the teachers' observations, [Delia]'s struggle to initiate assignments, sustain attention during assignments and finish assignments without significant support from a teacher continue to significantly impact [Delia] across settings at school. The amount of one-on-one attention they feel they need to give [Delia] to help her meet the demands of 5th grade at this point is making it difficult for the teachers to support the class as a whole. Without the opportunity to partner with an outside provider around her attention, executive functioning and impulsivity challenges **the School feels we need to add short-term, in-house support for**

> **[Delia] for the last two months of the year**. We want to make sure that [Delia] is able to successfully complete the 5th grade assignments in light of these challenges....

Email from K. Bird to N. Doe and J. Doe, March 23, 2018 (emphasis added).

129.    Prior to March 23, 2018, no teacher or administrator at FCS had advised the Does that Delia should have a personal care assistant or other one-on-one aide.

130.    All of Delia's "struggles" mentioned by the Principal – predictable manifestations of her ADHD – had been ongoing for several years, and Principal Bird did not note any marked uptick in their severity. The Does had not been lobbying for a one-on-one aide for Delia. Delia had had more absences than usual in the Spring of 2018–owed mostly to the anxiety and stress that the School itself was causing or exacerbating—but they had not resulted in any aberrational classroom behavior that Parents were aware of. The plan for a one-on-one aide struck the Does as curious also because it was not tied to the establishment of any particular educational or therapeutic program or goals that had been established for Delia or discussed with Parents.

131.    FCS's true purpose in installing a full-time one-on-one with Delia Doe was indicated in Principal Kelly Bird's email to Parents:

> [It] will help to boost her confidence and productivity and, as a result, ***mediate some of the disruptive calling out*** [*i.e.,* to teachers] ***and hurtful comments from [Delia]*** that have been more prevalent in the last few weeks.

*Id.* (emphasis added.) If "hurtful comments" from Delia had become "more prevalent" in the weeks prior to Bird's email, Delia's teachers had not seen fit to share that information with the Does. In any case, FCS was not providing the one-on-one aide principally – if at all – to help Delia make educational progress or to make up for legitimate absences; FCS was providing the aide for the purpose of insulating Delia's classmates from what were imagined to be her dangerous, and potentially homicidal, behaviors. The Principal explained to Parents:

> Ms. B [Budiwsky, the aide] and [Delia] will have **the option to work in the room, outside in the hall, or in the library**. Ms. B will attend special classes as well to help [Delia] stay on task and begin and finish assignments. Ms. B will also attend recess and be there to help monitor games that [Delia] is involved in to ensure rules are clear to the group and any disagreements are mediated.

K. Bird email to N. Doe and J. Doe, April 3, 2018. Principal Bird has made it plain that the aide will have the right (and duty, presumably) to remove Delia from the classroom on an "as needed" basis. Upon information and belief, the "security" role to be played by the one-on-one aide was generally conceived by, and suggested to the School by, anxious and desperate fifth-grade parents, including Mr. & Mrs. K. *See* ¶ 139, *infra*.

132.    Jack and Nancy Doe resisted the hasty installation of the one-on-one aide, for several reasons. First, they had no idea what role the aide would play, what the objectives were and how Delia would interact with the individual, and those were just a few of the unanswered questions. Second, Parents were very wary of any programming for Delia that might cause her to be isolated from her peers and marginalized, socially or otherwise. Third, FCS was attempting to characterize the need for the aide as one created by Mr. and Mrs. Doe. In Principal Bird's email to the Does, "Without the opportunity to partner with an outside provider around her attention, executive functioning and impulsivity challenges..." [Email of K. Bird to J. and N. Doe, March 23, 2018] is a thinly veiled reference to FCS's desire that Parents engage a health care provider who would prescribe ADHD medication. The notion that Parents necessitated the installation of a one-on-one at school is unconvincing, even preposterous.

133.    Nancy and Jack Doe's protests delayed the commencement of the one-on-one arrangement by a week. By that time, Nancy Doe had poured out her confusion and frustration over FCS's high-handed tactics in an email letter to Principal Bird, a true and complete copy of which (subject to redactions) is attached to this Complaint as "Attachment F." In this letter,

31

delivered April 9, 2018, Mrs. Doe excoriated FCS in particular for trumpeting to **all of the**

**parents of the FCS fifth-graders** the addition of a one-on-one aide for Delia, which is,

incidentally, the best evidence of the audience for whom the aide was intended:

> On one day, I am told that a person has been hired by the School specifically to
> serve as [Delia]'s one-on-one aide with no advance discussion with her father and
> I, and the aid would be starting the next day. And the next day, I am told that the
> School will be announcing the introduction of [Delia]'s aide to all of the parents of
> the 5th grade class. Although you claimed that [Delia] would not be identified, it
> was understood that the parents–not to mention the 5th graders themselves–would
> know exactly who the aide was intended for and they were meant to know. That
> was a breach of one of the most basic principles of privacy in education,
> particularly with regard to special education needs. For the School to put their own
> "PR" problem ahead of the interests of a child is beyond contempt.

Att. F, p. 2.

134.    In practice, the aide acted like an omnipresent cudgel, ostensibly keeping Delia in

line. Dr. Romano advised against the one-on-one aide, as she thought it was unhealthy for

Delia. On April 10, 2018, Nancy Doe reported:

> Ms. B sits with [Delia], stands with her in line, eats lunch with her, tries to hold
> her hand and even walks her to the bathroom. [Delia] asked her respectfully to
> please let up and her response was "I have to do my job." This is inconceivable.

135.    Virtually all of the measures that FCS proposed or implemented to address the

imminent threat to safety purportedly represented by Delia Doe **were conceived by, and foisted**

**on the School by,** Mr. & Mrs. K and their acolytes among the parents. As demonstrated by the

email correspondence between Mr. and Mrs. K and the School's administrators (*see* Att. C),

including the Defendants, **the impetus for those measures was largely racial bias** – in

particular, ugly misconceptions of racial difference.

136.    First, Principal Bird's serious consideration of mandatory body searches for Delia Doe derived directly from the inquiries made by Mrs. K, in her email of October 24, 2017, about weapons in the Does' home. [*See* ¶¶ 79, 81-82, *supra*.]

137.    Second, the pressure applied by Defendants on Parents to withdraw Delia from the School voluntarily arose directly from the demands of Mr. and Mrs. K and the other parents that Delia be removed from the School. [*See* ¶¶ 77, 87-89, 92-96, 107-08, *supra*.]

138.    Third, the restrictive measures the FCS imposed on Delia Doe's physical movements at School – the front-of-line surveillance, the isolation lunch with the Counselor, etc., were derived from the restrictions on Delia's interaction with A.K., Mr. and Mrs. K's daughter, that they insisted that the School observe. [*See* ¶¶ 110-11, *supra*; Att. C, pp. 2, 4.]

139.    Finally, the idea of adding a dedicated aide to Delia's fifth-grade classroom to assume "babysitting" duties for Delia and thereby free up scarce teachers' time, for the benefit of the students *other than* Delia, was specifically described in one of Mrs. K 's emails:

> Kelly and Melody listened to our concerns yesterday, but their response focused on ***all of the resources, effort, and human capital that will be spent supervising [Delia]'s behavior*** (both on the part of the teachers as well as other staff), all of which will come at a great cost to the other students in the class and grade.  They fully acknowledged this fact.

Att. C., p. 1 (emphasis added). The addition of the aide was justified on precisely the same basis by FCS's attorney, Michele Weckerly.

140.    Delia has remained under the care of Dr. Romano, but Nancy Doe has spent months, since November 2017, seeking additional therapeutic help and supports for Delia Doe.

141.    On or about February 28, 2018, Jack and Nancy Doe sent a letter to the MCIU, requesting that the MCIU conduct a re-evaluation of Delia Doe for special education services.

142.     Delia Doe was evaluated by a team at the MCIU, including two certified school

psychologists, in March 2018, and an Evaluation Report was issued on June 7, 2018. The

Evaluation Report concluded, among other things, that Delia was eligible for special education

supports and services:

> [Delia] meets educational criteria for Other Health Impairment (OHI). She
> displays difficulties with attention and impulsivity which adversely affect her
> educational performance. [Delia] is *eligible and in need of specially designed
> instruction and supports*.

143.     While a student at FCS, Delia Doe was never offered or provided special

instruction, supports or accommodations that would help her to access and obtain the benefit of

her education at FCS.

144.     Delia Doe attended the School for the last time in the year 2017-18 on June 8,

2018.

## CAUSES OF ACTION

### Count I

### Title III of the Americans With Disabilities Act of 1990
### Discrimination and Exclusion Based On Disability

#### (All Defendants)

145.     Plaintiffs repeat and re-allege each and every allegation set forth in the preceding

paragraphs of this Complaint as if set forth in full herein.

146.     By their knowing acts and omissions hereinabove described, including, without

limitation,

> a.  denying Delia Doe certain accommodations and classroom supports that were
>     recommended by private and public professionals to assist Delia in accessing and
>     benefiting from her education at FCS;

34

b.  failing to arrange for appropriate testing and evaluation of Delia that could identify conditions or differences that required special accommodations in the school environment;

c.  applying to Delia a set of disciplinary rules and standards, including the Behavior Plan, to which other students were not subject;

d.  singling out Delia for individualized treatment, such as the first-in-line treatment and mandatory lunch with a counselor, that served to isolate Delia from her classmates and stigmatize her;

e.  treating Delia publicly, by their words and actions, as a dangerous, violent or threatening child on the basis of her impulsivity and other manifestations of her disability;

f.  addressing their purported concerns about Delia's behaviors -- both legitimate and illegitimate -- in such a relentless and public manner so as to make her a pariah in the FCS community;

g.  determining to exclude Delia from admission to the FCS Middle School, expressly on the basis of her disability and the manifestations thereof; and

h.  not applying or committing the same treatment, identifications, discipline, concerns, failures, exclusions and other actions with respect to non-disabled children or with respect to other, similarly situated children with disabilities;

Defendants thereby denied Delia the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the School, or afforded her the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that was not equal to that afforded other students, all in violation of 42 U.S.C. §§ 12182(b)(1)(A)(i), (ii).

147.    By their knowing acts and omissions hereinabove described, Defendants in some instances provided Delia with a good, service, facility, privilege, advantage, or accommodation that was different or separate from that provided to other students, in violation of 42 U.S.C. § 12182(b)(1)(A)(iii).

148.    By their knowing acts and omissions hereinabove described, Defendants in some instances utilized standards or criteria or methods of administration, such as their arbitrary criteria for admission to the Middle School, that had the effect of discriminating against Delia on the basis of disability, in violation of 42 U.S.C. § 12182(b)(1)(D).

149.    By their knowing acts and omissions hereinabove described, including, *inter alia*, their deliberate refusal to implement, or implement fully, the classroom accommodations and supports that they knew were required to permit Delia Doe to benefit from an education at FCS, Defendants failed to make reasonable modifications in policies, practices, or procedures where such modifications were necessary to afford Delia the goods, services, facilities, privileges, advantages and accommodations otherwise available to students at the School, in violation of 42 U.S.C. § 12182(b)(2)(A)(i).

150.    In their acts and omissions described above, each of the Defendants acted intentionally or recklessly, with deliberate indifference to, and wanton disregard of, the health, safety and proper education of Delia Doe.

151.    With respect to this Count I, each of the Individual Defendants is sued in his or her official capacity.

## Count II

### Title III of the Americans With Disabilities Act of 1990
### Retaliation and Coercion

(All Defendants)

152.    Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint as if set forth in full herein.

153.    By their knowing acts and omissions hereinabove described, including, without limitation,

36

    a.  applying to Delia Doe a set of disciplinary rules and standards, including the Behavior Plan, to which other students were not subject;

    b.  singling out Delia for individualized treatment, such as the one-on-one aide, the first-in-line treatment and mandatory lunch with a counselor, that served to isolate Delia from her classmates and stigmatize her;

    c.  cajoling and harassing Delia and Parents to obtain Delia's voluntary withdrawal from the School;

    d.  threatening Delia with harsh disciplinary punishments as a result of acts on Delia's part that were manifestations of her disability; and

    e.  continually reprimanding Delia in the presence of other children for behaviors that were manifestations of her disability;

Defendants thereby threatened, intimidated, or interfered with an individual with a disability who was seeking to obtain or use the goods, services, facilities, privileges, advantages, or accommodations of a public accommodation, in violation of 34 C.F.R. § 36.206.

154.     In their acts and omissions described above, each of the Defendants acted intentionally or recklessly, with deliberate indifference to, and wanton disregard of, the safety, proper education and personal dignity of Delia.

155.     With respect to this Count II, each of the Individual Defendants is sued in his or her official capacity.

## Count III

### Civil Rights Act of 1866, 42 U.S.C. § 1981
### Discriminatory Treatment Based On Race

(Defendant FCS)

156.     Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint as if set forth in full herein.

157.    Defendant FCS had a contractual relationship with Parents since 2012, when Delia Doe entered kindergarten at the School. Such contractual relationship was evidenced by, though not entirely contained within, a separate agreement for each school year.

158.    Each school year from 2012-12 to 2017-18, the contract between Parents and FCS was renewed. Parents paid the prescribed tuition fees, after accounting for all scholarship monies awarded to Delia Doe, for each school year of Delia's enrollment.

159.    FCS unilaterally modified its contract with Parents during the 2017-18 school year by changing the terms on which Delia Doe would be educated at the School, including, *inter alia*, changing the disciplinary restrictions on Delia, imposing a one-on-one attendant on Delia for the entire school day and treating Delia generally like an imminent danger to the students and staff at the School.

160.    It was Parents' understanding and reasonable expectation, consistent with the past practice of FCS, that upon completion of Delia's fifth-grade year at the Lower School, Parents would be offered, consistent with FCS's past practice, a renewal contract for enrollment of Delia in the sixth grade at FCS's Middle School.

161.    In December 2017, Defendant FCS communicated to Parents that it was terminating its contractual relationship with Parents effective as of the end of the 2017-18 school year, and that it would not offer a new contract for Delia covering the 2018-19 school year. Defendant FCS therefore unilaterally modified its contract with Parents to impose a termination of the contract at the end of the 2017-18 school year, without any discussion with Parents whatever.

162.    FCS modified, then terminated, its contract with Parents because of demands from parents of FCS students that Delia be isolated as a dangerous person, removed from the

School, and ultimately expelled. Those demands were motivated by racial animus, in that they were based on stereotyping African-Americans as violent, mentally unstable, untrustworthy, prone to weapons use and dishonest.

163.    Defendant FCS and the Individual Defendants knew that the demands for Delia's severe restrictions on Delia Doe and, ultimately, her removal from the School were racially motivated, and proceeded to comply with those demands in spite of such knowledge.

164.    Defendant FCS's acts and omissions with respect to the modification and termination of the contractual relationship with Parents, as hereinabove described, were intentional.

165.    The assertions by FCS administrators that the modifications to, and termination of, its contract with Parents as hereinabove described were dictated by Delia's significant deficits in executive functioning skills and her needs for significant classroom supports and accommodations constituted a mere pretext for discrimination based on race. The hollowness of such assertions by FCS administrators is demonstrated by the School's failure to adopt the measures and accommodations that had previously been recommended by professionals to address those same skill deficits.

166.    Racial bias and discrimination impaired the existing contractual relationship between Parents and FCS and injured Delia Doe, who was the principal beneficiary of that relationship.

167.    White students at FCS similarly situated to Delia, including those white students who manifested symptoms of ADHD or had deficits in executive decision-making skills, were not subjected to the adverse treatment hereinabove described, including the restrictive measures and the removal, to which Delia Doe was subjected.

168.     In their acts and omissions described above, Defendant FCS acted intentionally or recklessly, with deliberate indifference to, and wanton disregard of, the safety, proper education and personal dignity of Delia Doe.

## Count IV

### Civil Rights Act of 1866, 42 U.S.C. § 1981
### Racially Hostile Environment

(Defendant FCS)

169.     Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint as if set forth in full herein.

170.     Defendant FCS knowingly and intentionally subjected Delia Doe and Parents to a racially hostile environment by, *inter alia*:

    a.  making Delia Doe's inappropriate outburst of October 16, 2017 into a topic of community-wide discussion and even publicity;

    b.  implementing measures such as the first-in-line formation, the isolation lunch and the one-on-one monitoring attendant that drew unwanted attention to Delia's predicament and served to stigmatize her among her peers;

    c.  acquiescing to, and validating, the parents' irrational fears of a dangerous child in their midst, which were racially based;

    d.  encouraging the fifth-grade parents' demands for Delia's removal by adopting or advocating certain restrictive and punitive measures specifically proposed by such parents, such as a physical weapons search of Delia and enforced separation from other children during unstructured times like recess and lunch periods; and

    e.  imposing on Delia a full-time minder and enforcer, in the guise of a one-on-one teacher's aide, which stigmatized her as a dangerous and/or helpless child who had to be managed.

171.     Although FCS and its administrators were well aware of the racial bias and stereotypes that informed the actions of the fifth-grade parents who sought Delia's removal from the School, FCS took no affirmative action to combat the irrational, race-based fears or the

racially motivated campaign for her removal. In fact, the verbal responses and actions of FCS and the other Defendants served only to encourage the adherents of that campaign.

172.    The restrictions, exclusions and punishments imposed on Delia Doe in the wake of the October 16 incident, many of the adverse taunts and bullying incidents suffered by Delia, and the statements and acts of FCS parents and staff aimed at driving her from the School, were all motivated by racial bias against Delia and Parents. All of such adverse actions and consequences were persistent and, taken together, severe.

173.    White students at FCS similarly situated to Delia, including those white students who manifested symptoms of ADHD, had deficits in executive decision-making skills or exhibited impulsiveness, were generally not subjected to the hostile environment, including the adverse actions and consequences hereinabove described, to which Delia Doe was subjected.

174.    In its and its employees' acts and omissions hereinabove described, Defendant FCS acted intentionally or recklessly, with deliberate indifference to, and wanton disregard of, the safety, proper education and personal dignity of Delia Doe.

175.    The racially hostile environment experienced by Delia Doe caused her acute anxiety and school phobia, effectively excluded her from her education and ultimately drove her from the School.

## Count V

### Breach of Contract

(Defendant FCS)

176.    Plaintiffs repeat and re-allege each and every allegation set forth in preceding paragraphs of this Complaint.

41

177.     Plaintiffs Jack and Nancy Doe and Defendant FCS entered into a binding
agreement under which the Does paid tuition and fees to FCS, and FCS would provide an
individualized educational program for Delia in light of her talents, abilities, weaknesses and
limitations.

178.     Defendant FCS held itself out as not only able to provide such an individualized
educational program but well known for its ability to do so.

179.     Plaintiffs Jack and Nancy Doe paid Defendant FCS in full all tuition, costs and
other related fees, as requested by Defendant FCS, for each year of her attendance at the School,
including the most recent school year, 2017-18.

180.     The terms of the contract between Plaintiffs Jack and Nancy Doe and Defendant
FCS were contained partly in a formal agreement that was entered into each year upon
matriculation, as well as all of the terms and conditions provided in its handbooks, brochures
and other writings that FCS made publicly available, or available to parents of students
generally, and writings that passed between FCS and the Does.

181.     Defendant FCS failed to provide an individualized education program for Delia
Doe appropriate to her talents, abilities and weaknesses.

182.     Defendant FCS failed to abide by the terms of the contract between it and
Plaintiffs Jack and Nancy Doe in that they intentionally discriminated against Delia Doe on
account of her disability and discriminated against her on the basis of her race.

183.     Defendant FCS and the other Defendants deliberately engaged in actions intended
to sabotage the contractual relationship with the Does, as conducted previously, and to
terminate their agreement during the 2017-18 school year without any legitimate justification

for such termination. Defendant FCS ceased providing any effective education program for Delia Doe at some time on or about October 16, 2017.

184.     Defendant FCS refused to renew its agreement with the Does for Delia's education for the 2018-19 school year, consistent with FCS's past practice, without any legitimate reason or justification for such refusal.

185.     Defendant FCS's failures to perform, attempts at termination and refusal to provide ongoing services were, in each case, a material breach of the express and implied terms of its agreement with the Does.

186.     As a direct and proximate result of such breaches,  Plaintiffs Jack, Nancy and Delia Doe have suffered damages, in an amount to be determined at trial.


## Count VI
### Breach of Implied Covenant of Good Faith and Fair Dealing
(Defendant FCS)

187.     Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs of this Complaint w.

188.     Pennsylvania law implies a covenant of good faith and fair dealing into any agreement between or among the parties.

189.     Defendant FCS failed to act with honesty in fact and observance of reasonable standards of fair dealing in the educational field.

190.     Defendant FCS further failed to take such actions as are necessary to carry out the purposes for which the agreement with Parents was made and to refrain from doing anything that would destroy or injure Plaintiffs' rights to receive the intended benefits of the agreement. Among other things, in October 2017 Defendant FCS began following the lead of influential

parents, instead of good educational practice, in determining how to manage Delia Doe and the turmoil in the fifth-grade class.

191.     Specifically, Defendant FCS has breached the implied covenant of good faith and fair dealing by: (a) publicly humiliating Delia Doe; (b) exacerbating Delia's anxiety level; (c) under the guise of accommodating her disability or enforcing behavioral norms, levying on Delia arbitrary and undeserved punishments far harsher than discipline imposed on other students for comparable or more egregious behavior; (d) creating and promoting a false narrative that the "fault" in the collapse of Delia Doe's tenure at the School belonged to Delia and Parents, while the School and its administrators were just trying to be supportive; and (e) inventing pretextual reasons why FCS was terminating and not renewing its contract with Plaintiffs for the education of Delia at the School in the 2018-19 academic year.

192.     On the basis of the foregoing, Defendant FCS has acted in bad faith and breached the implied covenant of good faith and fair dealing.

193.     As a direct and proximate result of this breach, Plaintiffs have suffered damages, in an amount to be determined at trial.

<u>Count VII</u>

**Breach of Fiduciary Duty**

(Defendants Acinapura, Bird and Sellars)

194.     Plaintiffs repeat and re-allege each and every allegation set forth in preceding paragraphs of this Complaint as if set forth in full herein.

195.     Each of Defendants Acinapura, Bird and Sellars held himself or herself out to the public and to Plaintiffs as a qualified and professional teacher, counselor or administrator, as the case may be, and as a trusted and devoted caregiver to Student, and thereby created and fostered

44

a fiduciary relationship with Delia Doe, who was in a position of vulnerability vis-à-vis each such Individual Defendant.

196.     Because of their respective qualifications and positions of authority, each of the Individual Defendants was in a position of overmastering influence with respect to Delia Doe.

197.     Delia Doe was in a position of weakness, dependence and trust vis-à-vis each of the Individual Defendants.

198.     Plaintiffs placed their trust and confidence in each of the Individual Defendants, who thereby had an obligation to act in the best interest of Delia Doe, to attend to her unique requirements and to ensure her fair access to her education.

199.     Accordingly, each of the Individual Defendants had a heightened duty to assist Delia and work for her best interest while Delia was under his or her instruction, custody and control.

200.     Each of the Individual Defendants breached his or her fiduciary duty to Student when, with actual knowledge of the aforementioned bullying of Delia Doe; the denial to Delia of the instruction, accommodations and supports that Delia needed to access and benefit from her education; and the coordinated campaign to isolate Delia at the School and then to remove Delia from the School; each such Individual Defendant either participated in the denial of appropriate supports or the isolation or dismissal of Delia, or failed to prevent, report or remedy the aforementioned bullying, denial, isolation or dismissal, and thereby failed to provide an environment in which Delia could be safe and free from harassment and be able to obtain the benefits of an education.

201.     Rather than nurture, mentor, monitor and assist Delia, as teachers and administrators are intended to do, the Individual Defendants emotionally, mentally and verbally

terrorized and publicly humiliated Delia, or participated in such terrorization or humiliation, and thereby exacerbated Delia's already elevated level of anxiety, which was well documented and fully disclosed to Defendants prior to or during Delia's fifth-grade year.

202.    Each of the Individual Defendants also breached his or her fiduciary duty to Delia Doe by creating or helping to implement an isolated educational environment for Delia, where she was denied normal interactions with her peers and teachers.

203.    As a direct and proximate cause of the breach by each of the Individual Defendants of his or her fiduciary duty to Delia Doe, Delia has endured and will continue to endure psychological and emotional suffering, including, but not limited to, post-traumatic stress, fear and anxiety.

204.    As a further direct and proximate result of the breach by each of the Individual Defendants of his or her fiduciary obligations to Delia Doe, Delia has suffered and will continue to suffer a loss of life's pleasures.

205.    The aforementioned acts and omissions of each of the Individual Defendants were committed in willful, wanton, reckless, and total disregard of the rights, welfare and educational needs of Delia Doe, thereby entitling Plaintiffs to punitive damages, and claim is hereby made therefor.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court for relief, as follows:

(a) That the Court enter judgment against Defendants FCS, Acinapura, Bird and Sellars;

(b) That the Court enter such injunctive orders as Plaintiffs may seek (1) to restore Plaintiffs to the position they would have occupied had Defendants not engaged in their discriminatory and tortious behaviors as hereinabove described and (2) otherwise, to provide such remedies as may be just and equitable;

46

(c) That the Court award compensatory and consequential damages to Plaintiffs in an amount to be determined at trial;

(d) That the Court award punitive damages to Plaintiffs in an amount to be determined at trial;

(e) That the Court award pre-judgment and post-judgment interest as permitted by law; and

(f) That the Court award such other, additional and separate relief as the case may require and/or that the Court may deem just and proper under the circumstances.

[THE REMAINDER OF THIS PAGE INTENTIONALLLY LEFT BLANK.]

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all matters capable of being so tried.

Respectfully submitted,

**MONTGOMERY LAW, LLC**
1420 Locust Street, Suite 420
Philadelphia, Pennsylvania 19102

*Counsel for Plaintiffs*

By: _____
Joseph W. Montgomery
Pa. Bar ID No. 209527

By: _____
Zachary Meinen
Pa. Bar ID No. 319861

**Filed:   August 16, 2018**

 # Educational Plan

| Student: | Class of: 2025 |
|---|---|
| DOB: | Educational Plan Date: 11/23/15;  8/25/16 |
| | |
| | |

# Educational Plan - Continued

[Red numerals
not in original]

| | | |
|---|---|---|
| 1 | ● | Multi-sensory approach to introducing new concepts |
| 2 | ● | Use of visual organizers, graphics, and tactiles for new concepts |
| 3 | ● | Use eye contact, saying her name a gentle touch to assure ████'s attentions before giving direction |
| 4 | ● | Minimize environmental distractions |
| 5 | ● | Work with ████ in small group during independent work when possible |
| 6 | ● | Use proximity to improve on task behavior and task completion |
| 7 | ● | Break independent work assignment into "mini-tasks" with timeline for completion |
| 8 | ● | Be mindful of peer pairings |
| 9 | ● | Movement breaks during long seated lessons (brain breaks) |
| 10 | ● | Remove unnecessary items from ████'s work area |
| 11 | ● | "Fidget" at her desk |
| 12 | ● | Therapy ball in place of chair |
| 13 | ● | Theraband around desk legs to kick |
| 14 | ● | Weekly or daily work area, desk, cubby clean outs to promote organization |
| 15 | ● | Time management and planning; encourage ████ to brainstorm and verbalize different strategies to complete a task, have ████ predict time needed to complete a task |
| 16 | ● | Predetermined hand signal or verbal cue when ████ demonstrates off task or impulsive behavior |
| 17 | ● | Closely monitor and intervene at start of a perceived problem |
| 18 | ● | Teach and model decision making criteria |
| 19 | ● | Encourage to "slow down" and think before acting |
| 20 | ● | Encourage self-monitoring of behavior using a predetermined period of self-monitoring and a jointly designed behavior-rating system with a target goal and no more than 3 ratings |
| 21 | ● | Drill and practice basic Math facts |

**Notes - please date & initial**

**2/9/17 Recommended Classroom Accommodations  from Psychologist Dr. Romano of Nemours DuPont**
- Wiggle cushion
- Stretching breaks and movement breaks
- Sitting in close proximity to teacher
- Deep breathing and strategies for refocusing
- Incentives for completing work and listening without disruption, this may include helping the teacher, another child, or engaging in a high interest activity
- Standing by desk to work
- Activities and materials available once work is complete, so she has something constructive to do
- Ability grouping to stay interested, active, and work to potential
- Opportunity to use things that ████ is good at doing and to provide her with opportunities to take the lead in class or help/assist the teacher and friends so that she can feel a part of the school climate and culture and be successful

**12/4/17 Verbal Consult with Dr. Romano from Nemours**
- Nonverbal signals
- Brain breaks
- Break down tasks
- Connect with ████ to remind of  strategies before engages in working with others

**Cognitive Ability Tests**

# Educational Plan – Continued

Wechsler Adult Intelligence Scale or Wechsler Intelligence Scale for Children x
>        Full Scale: 61%, Average
>        Verbal Comprehension Index (VCI): ██%, High Average
>        Visual Spatial Index (VSI): ██ Average
>        Fluid Reasoning Index (FRI), ██%, Average
>        Working Memory Index (WMI): ██%, Average
>        Processing Speed Index (PSI): ██ Average

Woodcock-Johnson Tests of Cognitive Abilities _____
Stanford Binet Intelligence Scales (when individually administered) _____
Kaufman Assessment Battery for Children _____
Differential Ability Scales _____
Reynolds Intellectual Assessment Scales _____

---

**Academic Achievement Tests**

**Reading**
Woodcock-Johnson Tests of Achievement (general and extended batteries that include fluency measures) _____
Scholastic Abilities Test for Adults _____

Wechsler Individual Achievement Test, with reading rate measure x
>        Total Reading ████████
>        Basic Reading Composite: ████████
>        Reading Comprehension and Fluency Composite: ████████

Kaufman Test of Educational Achievement _____
Gates-MacGinitie Reading Tests (when individually administered) _____

**Mathematics**
Woodcock-Johnson Tests of Achievement (general and extended batteries including fluency measures) _____
Scholastic Abilities Test for Adults _____

Wechsler Individual Achievement Test x
>        Mathematics Composite: ████████
>        Math Fluency Composite: ████████

Kaufman Test of Educational Achievement _____

**Written Language**
Woodcock-Johnson Tests of Achievement (general and extended batteries including fluency measures) _____
Scholastic Abilities Test for Adults _____

Wechsler Individual Achievement Test x
>        Written Expression Composite: ████████
>        Sentence Composition: ████████
>        Alphabet Writing Fluency: ████████
>        Essay Composition: ████████
>        Spelling: ████████

Test of Written Language _____
Kaufman Test of Educational Achievement _____

<u>Attachment B</u>



----- Forwarded Message -----
**From:** "Kelly Pierre" <kpierre@friendscentral.org>
**To:** ████████ ", " ████████████ >
**Cc:** "Jessica Corsaro" <jcorsaro@friendscentral.org>
**Sent:** Thu, Oct 20, 2016 at 5:56 PM
**Subject:** following-up

████ - While I regret what happened to ████ yesterday, and am working with a team here to make sure nothing like it happens again, I want to say how glad I was that we had so much time to sit and talk. I really enjoyed our conversation and getting to know you better.

I met with Jessica Corsaro and both teachers before school started today to make a plan to address the behavior that occurred, to support and check in on ████, and to alert specialist teachers about the behavior so they can keep an eye out.

Jessica met with ████ at lunch and I was out with 4th grade for the entire recess today. I know Jessica will be, if she hasn't already, communicating with you about her conversation with ████.

To reiterate what I said yesterday, we love ████ and want her to feel safe and be successful here at FCS.

Please don't hesitate to contact me moving forward. I look forward to seeing the ways your family's stories will enrich the class's learning and curriculum this year.

All my best,
Kelly
---


kpierre@friendscentral.org

**Mission:** We cultivate the intellectual, spiritual, and ethical promise of our students.

**Vision:** To awaken courage and intellect – and peacefully transform the world.

Page 1

---------- Forwarded message ---------
From: **Meena** ███ < ████████ >
Date: Tue, Oct 24, 2017 at 6:32 AM
Subject: Fwd: ███ ███
To: Meena ███ <meena.███@gmail.com>

Hi all -

Just wanted to share details of our meeting with Kelly and Melody and our last correspondence with the administration regarding the events of last week.  Kelly and Melody  listened to our concerns yesterday,  but their response focused on all of the resources, effort, and human capital that will be spent supervising ███ behavior (both on the part of the teachers as well as other staff), all of which will come at a great cost to the other students in the class and grade.  They fully acknowledged this fact.  **We have two new teachers who need to be focused on the academic mission, which both Eric and I believe has been seriously compromised this year.**

Again, please do not feel obligated to do or say anything regarding this issue.  However, I do feel that the administration is finally beginning to take our concerns seriously.  We need to continue to be vocal and hold the school accountable.  Eric and I have a follow-up meeting next Monday with Kelly and Melody.

---------- Forwarded message ----------
From: **Meena** ███████ <███████████@gmail.com>
Date: Mon, Oct 23, 2017 at 7:58 PM
Subject: Re: ███████████
To: Kelly Pierre <kpierre@friendscentral.org>
Cc: Acinapura Melody <macinapura@friendscentral.org>, ██████ Eric
<ekeuffel@gmail.com>, Lee Tina <tlee@friendscentral.org>, Lawrence
Brandi <blawrence@friendscentral.org>, Craig Sellers
<csellers@friendscentral.org>


Dear Kelly and Melody -

Thank you for meeting with us today, and thank you to Melody for meeting
with ██████. We agree that we are dealing with a horrible situation. Eric and
I continue to have serious concerns that the resources focused upon one
troubled child are detracting from the mission of teaching and learning for
the remainder of the class. Per our discussion today, we have informed
██████ that she will never be seated next to ██████ (either in a classroom,
meeting for worship, or during any type of transport), will never be alone
with her without supervision by an adult, and will never be required to do a
group project or exercise with her in any classroom setting. I just want to
make sure Tina and Brandi are aware of the details of our discussion.

As we both expressed during our meeting today, it our hope that ██████
obtains the professional psychiatric care she needs. In the meantime, we
will be exploring other educational options for ██████. We appreciate that
the school is taking the events of last week seriously. However, we will not
subject our daughter to chronic anxiety and fear due to taunts, bullying,
and threats of violence from ██████, which we believe will be the case if this
child is allowed to continue to matriculate at FCS.

Meena

<u>Attachment C</u>

On Mon, Oct 23, 2017 at 12:13 PM, Meena ███████
<<u>meena</u>████<u>@gmail.com</u>> wrote:

Kelly - Eric and I will be at school at 230.

\* \* \* \* \* \* \* \* \* \* \*

On Oct 23, 2017, at 9:55 AM, Kelly Pierre <<u>kpierre@friendscentral.org</u>>
wrote:

Meena -

We appreciate your concerns and would very much like to meet. We can
meet today at 11:30, 2:30  or 4:00. Please let us know which time works
best for you. We did not take the events from last week lightly and
responded very seriously.

We have a proactive and specific plan which was shared with the teachers
and family this morning. Teachers, Principals and Counselor are all making
ourselves available to provide support. We are giving special attention to
transitions, lunch and recess.

Best,
Kelly

--
Kelly Bird Pierre
Lower School Principal
Friends' Central School
1-610-642-7575
<u>kpierre@friendscentral.org</u>

<u>Attachment C</u>

On Sun, Oct 22, 2017 at 8:19 PM, Meena 
███████████@gmail.com> wrote:

Melody and Kelly- ███ finally opened up today after the Pumpkin Fair about how last week's incident in the bus and ███ 's ongoing bullying have affected her. She wanted her friends and family to think she was brave and not susceptible to the bullying and emotional abuse and threats. ███ stated that she is constantly worried and very anxious about what each day will bring at school because of ███ 's behavior. She has put up with with ███ 's nonsense since first grade, but it has never been quite as personal as it has been this year, with the puppet she created of ███ as well as the yearbook page caricaturing her. She heard from classmates about ███ 's threats to violently kill three boys in the class as well as to kill the class as a whole. Neither Eric nor I were aware of these other threats/instances of bullying. ███ as well as other children in the class are frightened for their safety. How are these children going to be able to learn anything this year in this emotionally chaotic environment?

███ is a very disturbed child and obviously needs a formal psychiatric evaluation. She has repeatedly inflicted injuries upon herself and blamed others for them, and threatens to do this constantly. She tried to strangle a classmate a few years ago. Her actions this year are unacceptable. Does she have access to guns or other weapons at home? How can the school assure the safety of our children after the threats she made? I do not think this child should be attending FCS.

We do not want ███ seated near ███ in either class. We also do not want ███ anywhere near ███ during recess, as this is where much of the bullying occurs (when students may not be directly supervised by teachers). We also do not want ███ to ever be alone with ███ (including in the bathroom) without an adult present.

███ is emotionally very fragile at present but will be attending school tomorrow. She would like to meet with both Melody and Jessica Corsaro tomorrow.

Eric and I would like to meet with Melody and Kelly as soon as possible.

Meena

--
Kelly Bird Pierre
Lower School Principal
Friends' Central School
1-610-642-7575
kpierre@friendscentral.org

**Mission:** We cultivate the intellectual,
spiritual, and ethical promise of our students.

**Vision:** To awaken courage and intellect –
and peacefully transform the world.

Revised 10/30/17

| Level | Behaviors | Next steps |
|---|---|---|
| Level 1 | General behaviors that are annoying or continue after adults or peers have asked her to stop. This includes eye rolling, borrowing things that are not hers without asking for permission. | Warning from a trusted adults - made into a coachable moment |
| Level 2 | Language that is unkind and directed towards another person or group. This includes name calling. Violating personal space. Damaging other people's property. | Conversation with principal or assistant principal; a break from a class period, part of the day, reparative step to make it right; email home. |
| Level 3 | Actions that are physically harmful or language that threatens others, being dishonest with adults, revengeful actions. | Conversation with principal or assistant principal; a break from a class period, part of the day, or whole day; call home; departure from the community. |

<u>Attachment E</u>

----- Forwarded Message -----
**From:** "Kelly Pierre" <<u>kpierre@friendscentral.org</u>>
**To:** "            " <                    >, "                " <p                    >
**Cc:** "Jessica Corsaro" <<u>jcorsaro@friendscentral.org</u>>
**Sent:** Fri, Mar 23, 2018 at 1:52 PM
**Subject:** supporting            after the break

Dear            and            –

I am so sorry to hear            is sick. She did not sound good at all when I was sitting with her in the nurse's office for a bit on Tuesday. I wish her a speedy recovery and hope that she gets the chance to enjoy some of her break.

Jessica and I had hoped to meet with you after your conference yesterday to share our plans for next steps after the break. Based on the teachers' observations,            's struggle to initiate assignments, sustain attention during assignments and finish assignments without significant support from a teacher continue to significantly impact            across settings at school. The amount of one-on-one attention they feel they need to give            to help her meet the demands of 5th grade at this point is making it difficult for the teachers to support the class as a whole. Without the opportunity to partner with an outside provider around her attention, executive functioning and impulsivity challenges the School feels we need to add short-term, in-house support for            for the last two months of the year. We want to make sure that            is able to successfully complete the 5th grade assignments in light of these challenges, in addition to missing a significant amount of school this year due to illness.

We are adding an additional adult to the 5B homeroom starting after the break to provide            the one-on-one attention she needs to successfully finish the year.

Our hope is that having an individual whose priority is to support            with her attention, executive functioning and impulsivity will help to boost her confidence and productivity and, as a result, mediate some of the disruptive calling out and hurtful comments from            that have been more prevalent in the last few weeks.

We would be happy to set-up a time to introduce you and            to this individual on the morning that they begin. I will let you know exactly which day that will be as soon as I have confirmation.

All my best,
Kelly

--

Attachment F

----- Forwarded Message -----
**From:** ████ < ████@yahoo.com>
**To:** Kelly Pierre <kpierre@friendscentral.org>
**Sent:** Monday, April 9, 2018, 5:24:03 AM PDT
**Subject:** One-on-one

Good morning Kelly,
I feel that I need to respond directly to some of the statements you made in connection with the assignment of a one-on-one aide to ████, and the community-wide announcement of same, as there seems to be a misunderstanding between us on some issues.

You stated in your 4/3 email that the aide was being put into place "because we still do not have any outside provider to partner with to support ████'s executive functioning challenges." I trust that you are not implying any delinquency on my or ████'s part in seeking appropriate professional help for ████ in areas of difficulty. As you know, ████'s problems with attention and organization are what led us to seek a re-evaluation of Chloe for special support services, which is underway. In fact, a report from the psycho-educational assessment done by Widener is expected to be ready in a few weeks. ████'s father and I hope that the Widener evaluation will point to constructive steps that can be taken by FCS, her family and outside professionals to help ████ overcome these obstacles.

I am never quite sure what you mean by your frequent references to "partnering" with outside providers. On its face, this appears to be an offer to help implement, in the school setting, advice given by ████'s health providers, but it is never entirely clear. You will recall that FCS showed a keen interest in "partnering" with Dr. Romano, ████'s therapist, over ████'s anxiety and school phobia issues. The results of that effort in partnering, however, were doubtful at best. Dr. Romano was asked whether ████ could be searched for weapons at the schoolhouse door. FCS implemented a new "behavior plan" for ████ that, instead of including strategies and reinforcement for positive behavior, merely created tighter disciplinary standards for ████ to live by. Certainly, nothing that Dr. Romano advised would have led, for example, to the practice of isolating ████ at lunch with the school counselor.

It is not obvious to me how some missed opportunity for partnering would have changed ████'s need for one-on-one supports, in any event. If ████'s challenges with regard to on-task behavior and executive functioning require the assistance of a one-on-one, it seems unlikely that some earlier effort at coordination alone would have averted that need.

You made several mentions of ████'s recent illnesses and medical appointments as a source of the backlog in ████'s school assignments that contributed to the need for a one-on-one. If that is the case, then the one-on-one is only that much more justified, having its origin partly in significant health issues.

I am relieved that the School has recognized that ████ could perform better with the right

supports in place. I wish that recognition had occurred earlier, before the decision was made to exclude her from the Middle School. Still, I am dismayed by the manner in which this one-one-one aide was introduced. On one day, I am told that a person has been hired by the School specifically to serve as ███ 's one-on-one aide with no advance discussion with her father and I, and the aid would be starting the next day. And the next day, I am told that the School will be announcing the introduction of ███ 's aide to all of the parents of the 5th grade class. Although you claimed that ███ would not be identified, it was understood that the parents not to mention the 5th graders themselves would know exactly who the aide was intended for and they were meant to know. That was a breach of one of the most basic principles of privacy in education, particularly with regard to special education needs. For the School to put their own "PR" problem ahead of the interests of a child is beyond contempt.

███ has been apart of FCS her entire life. The practices FCS has displayed to extinguish and expel her is not of FCS core value. ███ is disregarded as an "outsider" without warmth and compassion. Our family is still trying to grasp all that has taken place with our child at FCS and the length in which the school has gone to preserve and please their community. As ███ trembles with anxiety, uncertainty and fear throughout this process all I can do is reassure her that eventually it will all get better....

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

18-cv-3473

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JACK DOE and NANCY DOE, individually, and as Parents and Natural Guardians of DELIA DOE, a minor,

## DEFENDANTS
FRIENDS CENTRAL SCHOOL CORPORATION, MELODY ACINAPURA, KELLY O'CONNELL BIRD and CRAIG SELLARS

(b) County of Residence of First Listed Plaintiff ~~Montgomery~~  Delaware,
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Montgomery Cnty
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

(c) Attorneys *(Firm Name, Address, and Telephone Number)*
Joseph W. Montgomery, Esq.,
Montgomery Law, LLC, 1420 Locust Street, Suite 420, Philadelphia, PA 19102

Attorneys *(If Known)*
Michele L. Weckerly, Esq., Salmon, Ricchezza, Singer & Turchi LLP

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Pharmaceutical Slander Personal Injury | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Product Liability | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted | Liability ☐ 368 Asbestos Personal | | New Drug Application | ☐ 470 Racketeer Influenced and |
| Student Loans | ☐ 340 Marine Injury Product | | ☐ 840 Trademark | Corrupt Organizations |
| (Excludes Veterans) | ☐ 345 Marine Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment | Liability **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| ☐ 190 Other Contract | Product Liability ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | Injury ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 893 Environmental Matters |
| | ☐ 362 Personal Injury - Product Liability | Leave Act | | ☐ 895 Freedom of Information |
| | Medical Malpractice | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights **Habeas Corpus:** | Income Security Act | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 220 Foreclosure | ☐ 441 Voting ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment ☐ 510 Motions to Vacate | | 26 USC 7609 | Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Sentence | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| ☐ 245 Tort Product Liability | Accommodations ☐ 530 General | ☐ 462 Naturalization Application | | State Statutes |
| ☐ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | ☐ 465 Other Immigration | | |
| | Employment **Other:** | Actions | | |
| | ☒ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | | | |
| | Other ☐ 550 Civil Rights | | | |
| | ☐ 448 Education ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - | | | |
| | Conditions of | | | |
| | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Americans with Disabilities Act of 1990, 42 U.S.C. Secs. 12181-12189; Civil Rights Act of 1866
Brief description of cause:
Disability discrimination; Race discrimination

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  in excess of $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
08/16/2018

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**
RECEIPT # _____  AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

AUG 16 2018



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 65 Fairview Ave,Lansdowne PA 19050 _____

Address of Defendant: _____ 1101City Avenue, Wynnewood, PA 19096 _____

Place of Accident, Incident or Transaction: _____ Wynnewood, PA  18   3473 _____

---

**RELATED CASE, IF ANY:**

Case Number: _____   Judge: _____   Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year
   previously terminated action in this court?                                    Yes ☐   No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit
   pending or within one year previously terminated action in this court?         Yes ☐   No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier
   numbered case pending or within one year previously terminated action of this court?   Yes ☐   No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights
   case filed by the same individual?                                             Yes ☐   No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in
this court except as noted above.                                                      PA 209527

DATE: _8-16-2018_                    _____                  _____
                                     *Attorney-at-Law / Pro Se Plaintiff*        *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.**   *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☒ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
      *(Please specify):* _____

**B.**   *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
      *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, ___ Joseph W. Montgomery ___, counsel of record *or pro se plaintiff, do hereby certify:

☐    Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case
     exceed the sum of $150,000.00 exclusive of interest and costs:

☒    Relief other than monetary damages is sought.

DATE: _08/16/2018_                    _____                  _____ PA 209527 _____
                                                                                  *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

AUG 16 2018

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM



JACK DOE & NANCY DOE, INDIVIDUALLY
AND O/B/O DELIA DOE
v.
FRIENDS CENTRAL SCHOOL CORPORATION

CIVIL ACTION

18   3473

NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X)

| | | |
|---|---|---|
| 8-16-2018 | Joe Montgomery | Plaintiffs |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-650-7563 | 215-650-7563 | joe@ed-lhw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

AUG 16 2018