IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACK DOE AND NANCY DOE, in their individual capacities, and as Parents and Natural Guardians of DELIA DOE, a minor | : : : : | CIVIL ACTION |
| v. | : : | |
| FRIENDS CENTRAL SCHOOL CORPORATION, ET AL. | : : | NO. 18-3473 |

## <u>MEMORANDUM</u>

**Padova, J.**                                                                 **June 17, 2019**

Plaintiffs Jack and Nancy Doe bring this action in their individual capacities and on behalf of their daughter, Delia Doe, pursuant to Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 et seq., 42 U.S.C. § 1981, and state law.  Defendants have moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  For the following reasons, we grant the Motion in part and deny it in part.

## I.        FACTUAL BACKGROUND

### A.        <u>Delia Doe</u>

The Amended Complaint alleges that  Delia Doe is 11 years old and was enrolled at Friends Central School ("FCS" or the "School") from kindergarten through fifth grade.  (Compl. ¶ 30.) Delia and her parents are African-American.  (<u>Id.</u> ¶ 31.)  Delia was one of three African-American children in her fifth grade class of approximately 30 students during the 2017-18 school year.  (<u>Id.</u>) African-Americans make up less than 10% of the student body of FCS.  (<u>Id.</u>)

Delia showed signs of ADHD from early in her school career at FCS and had problems with "sustained attention, organization, and focus/staying on task."  (<u>Id.</u> ¶ 33.)  She was evaluated by the Montgomery County Intermediate Unit ("MCIU") in November 2015, when she was in

third grade.  (Id. ¶ 34.)  Melinda Hunt, a certified school psychologist, conducted the evaluation and diagnosed Delia with ADHD (Predominantly Inattentive Type).  (Id. ¶ 35.)  Hunt found that Delia has an average I.Q. score with her lowest scores in mathematics.  (Id. ¶ 36.)  Delia had been receiving math remediation services from the MCIU since 1st grade.  (Id. ¶ 39.)  Hunt stated in her report that Delia is "impulsive in her decisions and actions," misreads social situations, fails to assume responsibility for her actions, needs close monitoring in situations that "trigger impulsive/defiant behavior," and will say and do things that are unkind when she does not get her way.  (Id. ¶ 37.)  Delia also has "significant difficulties reading social cues and conforming her behavior," which results in conflicts with her peers and hurt feelings.  (Id. ¶ 38.)

Delia was the victim of bullying marked by racial hostility at FCS beginning in 2nd grade. (Id. ¶ 51.)  This bullying included the following:  (1) in February 2015, someone "bumped" Delia under the right eye with an elbow causing swelling; (2) in March 2015 a student moved Delia's chair, causing her to lose her balance and resulting in injuries to Delia's lower lip and right eye; (3) when Delia was in 3rd grade, another student called her a "nigger[;]"  (4) in May 2016, a third-grade boy struck Delia between the legs with an improvised football made of newspaper and tape, causing Delia to go to the hospital; (5) in 4th grade, a classmate named Melissa stabbed Delia with a pencil, threw her off the monkey bars, and threatened physical violence if Delia reported her abuse to teachers; (6) on October 19, 2016, Melissa took one of Delia's shoes and tried to flush it down the toilet with waste, while the shoe did not go down the toilet, Delia had to wear the shoe, which was soaked with urine, for the rest of the day.  (Id. ¶¶ 53-58.)  Delia's parents reported most of the bullying incidents to FCS, but the School always concluded either that the perpetrator's behavior was accidental or that Delia's culpability was equal to that of the perpetrator.  (Id. ¶ 61.)

FCS never disciplined or even reprimanded any of the children who bullied Delia, including Melissa. (Id. ¶¶ 59-62.)

      B.      The October 16, 2017 Incident and Initial Response

On October 16, 2017, Delia's fifth-grade class, supervised by three teachers, took a bus on a field trip. (Id. ¶ 63.) Delia wanted to sit next to her friend "Toby" on the bus and told other students, in very dramatic terms, what steps she would take to sit next to Toby, including "gouging out" the eyes of other students. (Id. ¶ 64.) Delia did not take any such action or injure any other student or staff member of FCS on October 16, 2017. (Id. ¶ 65.) After hearing from angry parents who sought adverse consequences for Delia, Bird and Assistant Principal Melody Acinapura launched an "investigation" of the October 16, 2017 incident in which they looked for other instances in which Delia had said things that insulted people or made them feel unsafe. (Id. ¶ 68.)

Immediately after the October 16, 2017 incident, Bird and Assistant Head of School Mariama Richards told the Does that Delia should "take a break from school" and that she could not return to FCS without "the support of a therapist in place." (Id. ¶ 70.) Delia's parents took her to Dr. Romano "for a medical/psychological assessment of whether [she] represented a threat to herself or to the school community." (Id. ¶ 71.) Dr. Romano cleared Delia to return to FCS on October 20, 2017. (Id.) Dr. Romano also spoke with Bird and Acinapura that day, after which Bird told Mrs. Doe that Delia was in wonderful hands with Dr. Romano and that Dr. Romano had "very helpful strategies to share with us for [Delia's] return to school on Monday." (Id. (alteration in original).) On October 23, 2017, at Bird's request, Mrs. Doe "gave Dr. Romano written permission to speak freely with FCS about . . . Delia's condition and treatment." (Id. ¶ 72.) On October 30, 2017, "Dr. Romano's written assessment, clearing Delia [to] return to school, was delivered to FCS." (Id.)

C.    The Reaction of Other Parents

Following the October 16, 2017 field trip, the parents of the other fifth-grade students joined together to punish Delia and have her removed from FCS.  (Id. ¶ 73.)  Eric K. and Meena T. ("Mr. and Mrs. K"), the parents of A.K., were the most vocal of the parents who sought to have Delia removed from FCS.  (Id. ¶ 74.)  On October 22, 2017, Mrs. K. sent an email to Bird, which she copied to most of the parents of the children in Delia's class, complaining about Delia's "threats to violently kill three boys in the class as well as to kill the class as a whole."  (Id. ¶¶ 75-76 (quotation omitted), Attach. C at 4.)  Mrs. K also stated that her daughter and "other children in the class are frightened for their safety."  (Id. Attach. C at 4.)  Mrs. K included the following statement in her email:

> [Delia] is a very disturbed child and obviously needs a formal psychiatric evaluation.  She has repeatedly inflicted injuries upon herself and blamed others for them, and threatens to do this constantly.  She tried to strangle a classmate a few years ago.  Her actions this year are unacceptable.  Does she have access to guns or other weapons at home? . . .  I do not think this child should be attending FCS.

(Id.)  Mrs. K's reference to "access to guns or other weapons" was intended to incite fear based on the Does' skin color in that it was based on "an insidious presumption that, as African-Americans, the Does were not only more likely to possess dangerous weapons, but more likely to allow their children to wield them."  (Id. ¶ 79.)  Mrs. K sent another email to Principal Bird on October 23, 2017, stating that A.K. should never be seated next to Delia, should never be alone with Delia, and should never be required to work on a group project with Delia.  (Id., Attach. C at 2.)  Shortly after Mrs. K sent the October 23, 2017 email, FCS implemented new restrictive measures for Delia that isolated her from her classmates.  (Id. ¶ 112.)  The restrictions included the following:  (1) "Delia was forced to walk at the head of any line of students" so "that she could be closely monitored;" (2) a teacher was required to supervise Delia at all times during recess; and (3) Delia "was required

to spend her lunch period with the [s]chool counselor." (Id.) These restrictions were not imposed to benefit Delia, but to appear to safeguard other students from Delia. (Id. ¶ 113.) The effect of these restrictions was to isolate Delia "and set her apart as a 'dangerous' threat." (Id.)

On November 1, 2017, Mrs. Doe met with Bird and told her that she and Mr. Doe were worried about the hostility of the other fifth-grade parents and their campaign against Delia. (Id. ¶ 93.) Bird told Mrs. Doe that FCS considered the other parents' behavior inappropriate. (Id.) In early November 2017, the other parents of FCS fifth-graders held a meeting to discuss Delia. (Id. ¶ 95.) Many of the parents complained that the School was not being sufficiently aggressive in forcing Delia to leave FCS. (Id.)

The Does believe that part of the hostility to Delia was driven "by salacious reports relating to the background of her father, Jack Doe, that had previously been circulated among many of the parents." (Id. ¶ 96.) Those reports had roots in Delia's second grade year, when the white parent of another second-grader hired a private investigator to look into the backgrounds of the parents of all of FCS' African-American second graders. (Id. ¶¶ 97-98.) The private investigator discovered that Jack Doe had a more than ten-year-old conviction for a minor, non-violent offense for which he did not serve any time in prison. (Id.) The parent who hired the private investigator subsequently began a campaign to stigmatize the children of African-American FCS families that she deemed to have a checkered past, while ignoring the children of white FCS parents with serious criminal convictions. (Id. ¶ 99.) This parent also tried to rally other FCS parents against the "tainted" African-American families and made the School and other parents aware of the information gathered by her investigator. (Id. ¶ 101.) FCS did nothing to quiet the fears stoked by this parent and by Mr. and Mrs. K. (Id. ¶¶ 103-04.)

D.    Attempts to Force Delia from FCS

On October 25, 2017, Bird, Richards, and Acinapura met with Mrs. Doe.  (Id. ¶ 80.)
During the meeting, the FCS administrators discussed "concerns" that they had about Delia's
ability to succeed in Middle School beginning in the Fall of 2018, particularly regarding "Delia's
social life and interaction with peers."  (Id.)  The FCS administrators told Mrs. Doe that, as a result
of the October 16, 2017 incident and the reaction of the school community, Delia would begin
Middle School at a significant disadvantage.  (Id. ¶ 81.)  In late October 2017, Bird suggested to
Mrs. Doe that the Does remove Delia from FCS immediately, "while Mrs. Doe could still collect
favorable letters of recommendation[] from Delia's teachers that would be useful in applying to
other schools."  (Id. ¶ 108.)  Bird implied that, if Delia were not promptly removed from FCS, she
might not get favorable recommendations later.  (Id.)

On October 30, 2017, Bird emailed the Does regarding a "Behavior Plan" that Bird and
other FCS staff members had developed for Delia.  (Id. ¶ 82.)  The Behavior Plan did not
emphasize positive supports like the Behavior Intervention Plans typically prepared for children
receiving special education services in schools subject to the Individuals with Disabilities
Education Act.  (Id. ¶ 83.)  Rather, the Behavior Plan prepared for Delia was more like a code of
conduct that "specif[ied] penalties for various levels of disciplinary infraction."  (Id., Attach. D.)
The Behavior Plan "was not based on a model that applied generally at FCS, but rather was
designed solely for Delia" with the goal of causing Delia to fail and be expelled from FCS.  (Id. ¶
85.)  The next day, Dr. Romano informed Mrs. Doe that Principal Bird had called "to ask her **if
Delia could be searched for weapons** when entering the School grounds."  (Id. ¶ 86.)

A few weeks after the Behavior Plan was put in place, Acinapura informed Mrs. Doe that
Delia was "walking on eggshells" and could not get another "Level One" discipline under the Plan.

(Id. ¶ 89.)  For the remainder of the School Year, most of Mrs. Doe's conversations with Bird and other employees of FCS concerned Defendants' belief that it was an "absolute imperative that Delia withdraw from FCS, or be expelled, at the soonest possible time."  (Id. ¶ 90.)  At the same time, other fifth-grade parents were going, in couples and groups, to the Head of School Craig Sellars, Bird, and other members of the FCS staff, seeking assurances that FCS would isolate Delia Doe and drive her from FCS.  (Id. ¶ 91.)  Bird and other FCS staff members were frank with Mrs. Doe that they were under intense pressure from other parents to find a "solution" to the "problem of Delia Doe."  (Id. ¶ 92 (emphasis omitted).)

On November 30, 2017, Bird told Mrs. Doe that "it would not be advisable for Delia to move on to the Middle School for the 2018-19 school year" because Delia could not handle the demands of the schedule at the Middle School as a result of her deficits in executive functioning and organization.  (Id. ¶ 117.)  However, this barrier to Delia's advancement to the Middle School was never mentioned before the October 16, 2017 incident.  (Id.)  Moreover, during the time Delia was enrolled at the School, "FCS had never denied a fifth-grade student promotion to the Middle School on account of concerns about his or her organization and executive functioning skills."  (Id. ¶ 118.)  On December 5, 2017, Bird told the Does that Delia would not be offered a contract to matriculate at the FCS Middle School for the 2018-19 school year.  (Id. ¶ 121.)

E.  The One-On-One Aide

On March 23, 2018, Bird sent Mrs. Doe an email stating that FCS would provide Delia with a full-time one-on-one aide.  (Id. ¶ 126, Attachment E.)  FCS had not previously discussed the use of a one-on-one aide with the Does, and the Does did not believe that Delia needed to have a full-time aide.  (Id. ¶¶ 127-29.)  Bird stated in the email that the one-on-one aide would mediate Delia's disruptive calling out and hurtful comments, although no one from FCS had told the Does

that Delia had been engaging in that behavior in the weeks prior to the email. (<u>Id.</u> ¶ 131.) The aide was given the authority to remove Delia from the classroom on an "as needed" basis and would also accompany Delia at recess and monitor her involvement in recess activities. (<u>Id.</u>) The hiring of the aide was announced to the other fifth-grade parents and the Does believe that the aide was hired at the suggestion of the other fifth-grade parents. (<u>Id.</u> ¶¶ 131, 133, Attach. F at 2.) The Does resisted the involvement of the one-on-one aide because they believed that the aide would further isolate Delia from her peers or marginalize her. (<u>Id.</u> ¶ 132.) Mrs. Doe sent a letter to Bird opposing the aide on April 9, 2018. (<u>Id.</u> ¶ 133; Attach. F.) Dr. Romano also opposed the aide and thought that it would be unhealthy for Delia. (<u>Id.</u> ¶ 134.) On April 10, 2018, Mrs. Doe reported that that aide "sits with [Delia], stands with her in line, eats lunch with her, tries to hold her hand and even walks her to the bathroom. [Delia] asked her respectfully to please let up and her response was 'I have to do my job.'" (<u>Id.</u> (alteration in original).)

Virtually all of the measures that the School adopted to address Delia's threat to the safety of others were conceived of by Mr. and Mrs. K and other fifth-grade parents who were motivated by racial bias. (<u>Id.</u> ¶ 135.) For example, Bird considered mandatory body searches for Delia because Mrs. K asked whether Delia had access to weapons in her home in the October 22, 2017 email. (<u>Id.</u> ¶ 136; Attach. C at 4.) Defendants pressured Mr. and Mrs. Doe to withdraw Delia from FCS because Mr. and Mrs. K and other parents demanded that Delia be removed from FCS. (<u>Id.</u> ¶ 137.) The restrictive measures that FCS imposed on Delia's physical movements at the School (front of line surveillance, being required to eat lunch with the counselor, etc.) arose because Mr. and Mrs. K insisted that FCS restrict Delia's interactions with their daughter. (<u>Id.</u> ¶ 138.) The idea of hiring a full-time one-on-one aide for Delia was also suggested in one of Mrs. K's emails to FCS. (<u>Id.</u> ¶ 139, Attach. C at 1.)

Delia was aware of the negative attention focused on her by the rest of the FCS community after October 16, 2017. (Id. ¶ 115.) She was also aware that the parents of her classmates were aligned against her and was aware of the pressure put on her parents to remove her from FCS. (Id.) Delia became anxious about going to school and sometimes was not able to attend. (Id.) The Does sent Delia to therapy for her anxiety. (Id.)

F.     <u>Delia was Treated Differently Than Other Students</u>

While Delia was enrolled at FCS, there were instances in which white students threatened to "blow up the school" or "mow down" a teacher or inflict other violence or terror on FCS. (Id. ¶ 114.) FCS did not establish Behavior Plans for any of these white students or isolate the white students the way Delia was isolated. (Id.) In one such instance, on January 16, 2018, two of Delia's white male classmates ("Chad" and "Chuck") play acted a shoot-out, with simulated weapons, in full view of their teacher. (Id. ¶ 123.) This went on for more than five minutes, even after Chuck told Chad to stop shooting him and that he was already dead. (Id.) Chuck and Chad were not disciplined for shooting play and threats of shooting. (Id. ¶ 124.)

The Complaint asserts seven grounds for relief. Counts I and II of the Complaint assert that Defendants discriminated against Delia in violation of Title III of the ADA; Counts III and IV assert that Defendants discriminated against Delia on the basis of her race in violation of 42 U.S.C. § 1981; Count V asserts a state law claim against FCS for breach of contract; Count VI asserts a state law claim against FCS for breach of the covenant of good faith and fair dealing; and Count VII alleges a state law claim against Defendants Bird, Acinapura and Sellars for breach of fiduciary duty. Defendants ask us to dismiss Counts I and II for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and to dismiss all Counts of the Complaint for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).

## II.    SUBJECT MATTER JURISDICTION

### A.    Legal Standard

Defendants argue that Plaintiffs' ADA claims should be dismissed because Plaintiffs lack standing to bring a claims for injunctive relief under Title III of the ADA.  "'A motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter.'"  Constitution Party of Pa. v. Aichele, 757 F.3d 347, 357 (3d Cir. 2014) (alteration in original) (quoting Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007)). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing [standing]."  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990)).  In order to survive a motion to dismiss, Plaintiffs must demonstrate that they possess the requisite stake in the outcome of their suit to have standing by showing that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  Id. (stating that these three elements are the "irreducible constitutional minimum" of standing) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (remaining citation omitted)); see also Hollingsworth v. Perry, 570 U.S. 693, 704 (2013); Constitution Party of Pa., 757 F.3d at 360 (citations omitted).  An injury-in-fact requires "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan, 504 U.S. at 560 (internal quotation marks and citations omitted); see also Spokeo, 136 S. Ct. at 1545 ("[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both concrete and particularized." (quotation omitted)).

Defendants bring a facial challenge to Plaintiffs' standing to assert the ADA claims in Counts I and II.  Consequently, we consider the "claim on its face" and determine whether it is

"insufficient to invoke the subject matter jurisdiction of the court" due to some "jurisdictional defect." Constitution Party of Pa., 757 F.3d at 358. This type of attack is judged under the same standard as a motion to dismiss pursuant to Rule 12(b)(6). Id. Consequently, as we discuss in more detail in Section III.A. below, we "'only consider the allegations of the complaint and documents referred therein and attached thereto, in the light most favorable to the plaintiff.'" Id. (quoting In re Schering Plough Corp. Intron/Temodar Consumer Class Action, 678 F.3d 235, 243 (3d Cir. 2012)). In order to survive this Motion to Dismiss, the Complaint must "clearly . . . allege facts demonstrating each element" of standing. Spokeo, 136 S. Ct. at 1547 (alteration in original) (quotation omitted).

B.     Discussion

Title III of the ADA provides that: "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[1] 42 U.S.C. § 12182(a). A complaint asserting a claim of disability discrimination pursuant to Title III must allege "'(1) discrimination on the basis of a disability; (2) in the full and equal enjoyment of goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation; (3) by the public accommodation's owner, lessor or operator.'" Giterman v. Pocono Med. Ctr., 361 F. Supp. 3d 392, 404 (M.D. Pa. 2019) (quoting Anderson v. Franklin Inst., 185 F. Supp. 3d 628, 642 (E.D. Pa. 2016)). Private plaintiffs, such as the Does, are not entitled to obtain monetary damages

---

[1] Defendants also argue that Plaintiffs' ADA claims should be dismissed because FCS is not a place of public accommodation. However, we need not address that argument here, as we grant the Motion to Dismiss as to the ADA claims because the Complaint does not allege that the Does have standing to bring those claims.

under Title III of the ADA and, thus, they are entitled only to prospective injunctive relief.  Id. (citing Anderson v. Macy's Inc., 943 F. Supp. 2d 531, 538 (W.D. Pa. 2013)).  "To establish standing in an action for injunctive relief, a plaintiff must show that he or she is likely to suffer *future* injury from the defendant's illegal conduct."  Doe v. Nat'l Bd. of Med. Exam'rs, 210 F. App'x 157, 159-60 (3d Cir. 2006) (citing Roe v. Operation Rescue, 919 F.2d 857, 864 (3d Cir. 1990)).  Thus, "[p]ast illegal conduct is insufficient to warrant injunctive relief unless it is accompanied by 'continuing, present adverse effects.'"  Id. at 160 (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983)).

"'A plaintiff seeking to meet his burden of showing a sufficient imminent injury in a Title III ADA case may use one of two methods: the intent to return method or the deterrent effect doctrine.'"  Giterman, 361 F. Supp. 3d at 405 (quoting Hollinger v. Reading Health Sys., Civ. A. No. 15-5249, 2016 WL 3762987, at *10 (E.D. Pa. July 14, 2016)).  In order to allege imminent injury under the intent to return method, a complaint must allege that "(1) . . . the defendant engaged in past discriminatory conduct that violates the ADA; (2) it is reasonable to infer from allegations in the complaint that the discriminatory conduct will continue, and (3) it is reasonable to infer . . . that the plaintiff intends to return to the public accommodation in the future."  Hollinger, 2016 WL 3762987, at *11 (citations omitted).  To allege imminent injury under the deterrent effect doctrine, a complaint must allege that "the plaintiff was 'deterred from patronizing a public accommodation because of a defendant's failure to comply with the ADA.'"  Id. (quoting Kratzer v. Gamma Mgmt. Grp., Inc., Civ. A. No. 04-6031, 2005 WL 2644996, *2 (E.D. Pa. Oct. 12, 2005)).  While the Complaint alleges past discriminatory conduct, it does not allege that the Does intend to enroll Delia at FCS in the future or that Delia was deterred from patronizing FCS because of Defendants' failure to comply with the ADA.  See Mirabella v. William Penn Charter

Sch., Civ. A. No. 15-1162, 2017 WL 1062460, at *3 (E.D. Pa. Mar. 20, 2017) (concluding that plaintiffs lacked standing to assert a claim against defendant under Title III of the ADA because "nothing in the record establishes that, at the time the case was initiated, [plaintiff student] had any intention to return to [defendant school], even if the alleged unlawful conduct had been remedied").

Plaintiffs, however, argue that they have standing to assert claims for violation of Title III of the ADA because Delia continues to suffer injury from Defendants' past wrongdoing. However, the only continuing injuries alleged in the Complaint are emotional. Allegations of continuing emotional consequences arising from violations of Title III of the ADA are not sufficient to satisfy the future injury requirement for standing to pursue injunctive relief. See Lyons, 461 U.S. at 107 n.8 (stating that "[t]he emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant"); McCormick v. Kline, 670 F. App'x 764, 765 (3d Cir. 2016) ("Absent a real and immediate threat of future injury by the defendant, injunctive relief is not an appropriate remedy for the emotional consequences of single prior act." (citing Lyons, 461 U.S. at 107 n.8)). We conclude, accordingly, that the Complaint does not allege facts sufficient to establish that Plaintiffs have standing to assert claims pursuant to Title III of the ADA, and we grant Defendants' Motion to Dismiss as to Counts I and II of the Complaint.

## III.    RULE 12(b)(6)

Defendants have moved to dismiss the remainder of the Complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

### A.    Legal Standard

When considering a motion to dismiss pursuant to Rule 12(b)(6), we consider "only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as

undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).  We "'accept all factual allegations [of the complaint] as true [and] construe the complaint in the light most favorable to the plaintiff.'" DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (second alteration in original) (quoting Warren Gen. Hosp. v. Amgen Inc., 643 F.3d 77, 84 (3d Cir. 2011)).  A plaintiff's pleading obligation is to set forth "'a short and plain statement of the claim,'" which gives "'the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2), and Conley v. Gibson, 355 U.S. 41, 47 (1957)).  The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"  Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).

B.    Section 1981 Claims

Counts III and IV assert claims of racial discrimination in violation of 42 U.S.C. § 1981. Count III alleges that Defendants breached their contractual relationship with the Does because of their race in violation of § 1981.  Count IV alleges that Defendants knowingly and intentionally subjected Delia Doe and her parents to a racially hostile environment in violation of § 1981. Section 1981 provides, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

42 U.S.C. § 1981(a). Generally, to state a claim under § 1981, a complaint must plausibly allege the following elements: "(1) [that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute . . . ." Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001) (alteration in original) (quotation omitted). Thus, "[t]o state a Section 1981 discrimination claim, a plaintiff must show that the defendant intentionally discriminated against her because of race in the making, performance, enforcement, or termination of a contract or for such reason denied her the enjoyment of benefits, terms or conditions of the contractual relationship." Katchur v. Thomas Jefferson Univ., 354 F. Supp. 3d 655, 668 (E.D. Pa. 2019) (quotation omitted). "'[A] contract for educational services is a "contract" for purposes of § 1981.'" Id. (alteration in original) (quoting Gratz v. Bollinger, 539 U.S. 244, 276 n.23 (2003)).

Defendants argue that Counts III and IV should be dismissed because the Complaint does not allege that they acted with discriminatory animus. See Handy v. Palmiero, Civ. A. No. 17-3107, 2018 WL 4680265, at *3 (E.D. Pa. Sept. 28, 2018) (granting motion to dismiss § 1981 claim because complaint did not allege that defendants' conduct was motivated by race). Defendants contend that the Complaint merely alleges that the other fifth-grade parents were motivated by race but does not allege that they (the Defendants) acceded to any of the racial bias-based demands made by those parents. (See Compl. ¶¶ 97-103.) Defendants further maintain that there are no allegations that they were involved with, condoned, or were complicit in the racial bias or animus on the part of Mr. and Mrs. K and that the Complaint thus contains no allegations that would support a plausible claim or inference that they acted as a result of discriminatory animus.

The Complaint does, however, allege that Defendants imposed restrictions on Delia in response to racial-bias based demands made by the other fifth-grade parents, including Mr. and

Mrs. K. (See Compl. ¶¶ 86, 112-13, 131, 162-63.) Moreover, even if these allegations were not sufficient to plausibly allege intentional discrimination on the part of Defendants, the Complaint need not contain specific allegations of discriminatory intent in order to state a claim of discrimination in violation of § 1981. "When a student-plaintiff does not assert or cannot present direct evidence of discrimination, then his claims are subject to the familiar McDonnell-Douglas burden-shifting analysis as adapted to the educational context." Underwood v. La Salle Univ., Civ. A. No. 07-1441, 2007 WL 4245737, at *6 (E.D. Pa. Dec. 3, 2007) (citing Manning v. Temple Univ., Civ. A. No. 03-4012, 2004 WL 3019230, at *4 (E.D. Pa. Dec. 30, 2004)); see also Kant v. Seton Hall Univ., 289 F. App'x 564, 566 (3d Cir. 2008) (noting that, in the absence of direct evidence of discriminatory intent, § 1981 discrimination claims are analyzed "under the familiar burden-shifting framework established by McDonnell Douglas v. Green, 411 U.S. 792 (1973)" (citations omitted)). In order to state a § 1981 claim for discrimination in an educational setting under the McDonnell Douglas framework, a complaint must allege the following: (1) the plaintiff "is a member of a protected class;" (2) the plaintiff "suffered an adverse action at the hands of the defendants in [her] pursuit of [her] education;" (3) the plaintiff "is qualified to continue [her] pursuit of [her] education;" and (4) the plaintiff "was treated differently from similarly situated students who are not members of a protected class." Ke v. Drexel Univ., Civ. A. No. 11-6708, 2015 WL 5316492, at *17 (E.D. Pa. Sept. 4, 2015), aff'd sub nom. Lei Ke v. Drexel Univ., 645 F. App'x 161 (3d Cir. 2016) (citing Bell v. Ohio State Univ., 351 F.3d 240, 252-53 (6th Cir. 2003)).

"If a plaintiff is able to make a prima facie case under these four elements, the burden then shifts to the defendant, who must 'articulate some legitimate non-discriminatory reason' for the adverse action." Id. (quoting McDonnell Douglas, 411 U.S. at 802). "If a defendant satisfies this standard, a plaintiff would then have to show that the legitimate non-discriminatory reason was

mere 'pretext' for unlawful discrimination." Id. "This requires a showing that each of the defendant's proffered nondiscriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the adverse action." Id. (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

The Complaint alleges that Plaintiffs are African-American, satisfying the requirement that it allege that they belong to a protected class. (Compl. ¶ 31.) The Complaint also alleges that Defendants unreasonably and severely disciplined Delia and restricted her ability to participate in the education program at FCS, causing her severe anxiety, and eventually prevented Delia from matriculating in the sixth grade at FCS's Middle School. (Id. ¶¶ 83, 90, 107-08, 112-13, 115-18, 126, 131, 134, 159-62, 170, 175; Attach. D.) We conclude that these allegations satisfy the requirement that the Complaint allege that Delia "suffered an adverse action at the hands of the defendants in [her] pursuit of [her] education." Ke, 2015 WL 5316492, at *17. The Complaint further alleges that Delia's academic report for the first semester of the 2017-18 school year showed that she was capable of average to above-average performance in every subject except for math and that Delia was receiving assistance with math from the MCIU. (Compl. ¶¶ 39, 48.) We conclude that these allegations satisfy the requirement that the Complaint allege that Delia "is qualified to continue [her] pursuit of [her] education." Ke, 2015 WL 5316492, at *17. The Complaint also alleges that FCS students who did not belong to Delia's protected class were not disciplined for acts of verbal and physical violence, including verbal threats to "blow up the school," and "otherwise inflict violence and terror on the School," "play-acting a shoot-out," or failing to stop "shooting" when one of the participants wanted to stop. (Compl. ¶¶ 62, 114, 123-24.) We conclude that these allegations satisfy the requirement that the Complaint allege that Delia "was treated differently from similarly situated students who are not members of [her]

protected class." Ke, 2017 WL 5316492, at *17.  We further conclude, accordingly, that the Complaint alleges a facially plausible prima facie case of race discrimination in violation of § 1981.  We therefore deny the Motion to Dismiss as to Counts III and IV of the Complaint.

### C.  Breach of Contract Claims

#### 1.  Count V

Count V asserts a claim of breach of contract against FCS under Pennsylvania law. Specifically, Count V asserts that the terms of the Does' contract with FCS are contained in the formal agreement that the Does entered into with FCS each year, in the terms and conditions contained in the handbooks, brochures and other writings that FCS made available to parents of students, and in writings that FCS provided to the Does.  (Compl. ¶ 180.)  The Complaint further alleges that FCS breached its contract with the Does by failing to provide an individualized education program for Delia, discriminating against Delia on account of her disability and race, terminating its contract with the Does without legitimate justification, failing to provide an effective education program for Delia after October 16, 2017, and refusing to renew its agreement with the Does for Delia's education for the 2018-19 school year.  (Id. ¶¶ 181-84.)

"[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against [an] institution for breach of contract where the institution ignores or violates portions of the written contract." Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999) (citations omitted).  To state a claim for breach of contract under Pennsylvania law, a complaint must specifically allege:  "(1) the existence of a contract (including its essential terms), (2) a breach of the contract, and (3) damages."  Cessna v. Rea Energy Coop., Inc., 753 F. App'x 124, 128 (3d Cir. 2018) (citing Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564 (Pa. Super. Ct. 2004)).

Defendants argue that Count V should be dismissed because the Complaint does not plausibly allege that FCS breached its 2017-18 Re-Enrollment Contract with the Does. They first contend that the terms of the contract between the Does and FCS are contained solely in its 2017-18 Re-Enrollment Contract with the Does (Sellars Decl. Ex. 5[2]) because that document is clear and unambiguous. See Solomon v. U.S. Healthcare Sys. of Pa., Inc., 797 A.2d 346, 349 (Pa. Super. Ct. 2002) (observing "the well-settled rule that when interpreting a contract, a court must construe it as it is written, giving effect to the clear language and plain meaning of the words. And, where the contract terms are clear and unambiguous, there is no need to consider other evidence to interpret those provisions" (citation oimtted)). Plaintiffs maintain, however, that many of the terms of their agreement with FCS are not spelled out in the 2017-18 Re-Enrollment Contract but are contained in other written material provided to them by FCS, such as the Student Handbook. In particular, the 2017-18 Re-Enrollment Contract states that "the School has the right to terminate this Enrollment Contract, at any time, due to . . . disciplinary issues with respect to the Student, and/or the lack of parental cooperation with respect to School-related issues" and that "the Student will abide by the reasonable regulations set up by the School administration, which require suitable standards of behavior, . . . and good citizenship." (Sellars Ex. 5 at 3.) However, the terms "disciplinary issues," "reasonable regulations," "suitable standards of behavior," and "good citizenship" are not defined or described in the 2017-18 Re-Enrollment contact, and Plaintiffs assert that these terms are spelled out only in other documents provided to them by FCS. "'[T]he contract between an educational institution and a student includes any agreement between the

---

[2] Defendants have submitted a copy of Plaintiffs' 2017-18 Re-Enrollment Contract with FCS as Exhibit 5 to the Declaration of Craig Sellars, Head of School for FCS. We may consider this document in the context of the Motion to Dismiss as Plaintiffs do not challenge the authenticity of this document and Plaintiffs' claims are partially based upon this document. See Mayer, 605 F.3d at 230.

parties . . . contained within a portion of the student handbook.'" Doe v. Univ. of Sciences, Civ. A. No. 19-358, 2019 WL 632022, at *6 (E.D. Pa. Feb. 14, 2019) (quoting Doe v. Trs. of the Univ. of Pa., 270 F. Supp. 3d 799, 810 (E.D. Pa. 2017)). Accordingly, we conclude that the terms of the contract between the Does and FCS include the relevant terms of the FCS Student Handbook.

FCS further argues that we should dismiss Plaintiffs' breach of contract claim because, under the unambiguous language of the 2017-18 Re-Enrollment Contract, FCS was under no obligation to accept Delia for matriculation into sixth grade for the 2018-19 school year and, therefore, could not have breached that contract by failing to accept Delia for sixth grade. However, it is not clear from the record before us whether the Student Handbook may impose such an obligation on FCS. Moreover, Plaintiffs' breach of contract claim does not just assert that Defendants' failure to enroll Delia for sixth grade in the 2018-19 school year breached their contract with FCS. The Complaint also asserts that FCS breached its contract with the Does by failing to provide an individualized education program for Delia, discriminating against Delia on account of her disability and race, terminating its contract with the Does without legitimate justification, and failing to provide an effective educational program for Delia after October 16, 2017. (Compl. ¶¶ 181-83.) Accordingly, we deny the Motion to Dismiss as to Plaintiffs' claim of breach of contract in Count V of the Complaint.

2.    Count VI

Count VI of the Complaint asserts a claim for breach of the implied covenant of good faith and fair dealing against FCS. Count VI asserts that FCS breached the implied covenant of good faith and fair dealing in its contract with the Does by failing to take necessary actions to carry out the purpose of its agreement with the Does and by failing to refrain from taking actions that would destroy or impede the Does' rights to receive the intended benefits of that agreement. (Id. ¶ 190.)

Specifically, Count VI alleges that FCS breached the implied covenant of good faith and fair dealing in its agreement with the Does by publicly humiliating Delia, exacerbating Delia's anxiety, imposing arbitrary and undeserved punishments on Delia, creating a false narrative that it was Delia's fault that she could not remain at the school, and inventing pretextual reasons why it would not permit Delia to matriculate at the School for the 2018-19 school year.  (Id. ¶ 191.)

Defendants argue that we should dismiss Count VI because Pennsylvania law does not recognize an independent claim for breach of the covenant of good faith and fair dealing.  See Sheinman Provisions, Inc. v. Nat'l Deli, LLC, Civ. A. No. 08-453, 2008 WL 2758029, at * 3 (E.D. Pa. July 15, 2008) ("Pennsylvania does not recognize a claim for breach of the covenant of good faith and fair dealing as an independent cause of action." (citation omitted)).  However, while there is no independent action for breach of the implied covenant of good faith and fair dealing, such a claim may be brought as a breach of contract claim.  See Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F. Supp. 2d 416, 426 n.8 (E.D. Pa. 2011) (noting that a claim for breach of the covenant of good faith and fair dealing "is a breach of contract action" (citing Burland v. ManorCare Health Servs., Inc., Civ. A. No. 98-4802, 1999 WL 58580, at *4 (E.D. Pa. Jan. 26, 1999))).  "In other words, . . . a plaintiff pursuing an implied duty theory must bring a breach of contract action, not an independent cause of action for breach of the covenant of good faith and fair dealing."  Id.  The Complaint does not allege that FCS breached an independent duty of good faith and fair dealing. Rather, it alleges that FCS breached the covenant of good faith and fair dealing that is implied in its agreement with the Does.  (See Compl. ¶ 188.)  Consequently, we conclude that Count VI plausibly asserts a breach of contract claim based on FCS's alleged breach of its implied covenant of good faith and fair dealing in its agreement with the Does, and we deny the Motion to Dismiss as to Count VI.

D.    Breach of Fiduciary Duty

Count VII of the Complaint asserts a claim for breach of fiduciary duty against Defendants Bird, Acinapura, and Sellars. The Complaint alleges that Defendants Bird, Acinapura and Sellars breached their fiduciary duties to Delia by denying Delia "the instruction, accommodations and supports that [she] needed to access and benefit from her education;" by participating in a "coordinated campaign to isolate Delia" and remove her from the School; and by failing to prevent, report, or remedy the bullying of Delia. (Compl. ¶ 200.) The Complaint further alleges that Delia suffered psychological and emotional suffering as a result of these breaches of Defendants' fiduciary duties to her, including post-traumatic stress, fear, and anxiety. (Id. ¶ 203.)

Defendants argue that Count VII does not allege a facially plausible claim for breach of fiduciary duty because it alleges only that the Does disagreed with FCS's recommendations for Delia and the accommodations that it provided to Delia. See Walsh v. Krantz, Civ. A. No. 07-616, 2008 WL 3981492, at *7 (M.D. Pa. Aug. 22, 2008), aff'd 386 F. App'x 334 (3d Cir. 2010) (explaining that a "mere disagreement with . . . educational recommendations and practices, without more, does not transform them into breaches of a fiduciary duty"). Defendants do not deny that Defendants Bird, Acinapura, and Sellars owed a fiduciary duty to Delia.

Under Pennsylvania law, a complaint asserting a claim for breach of fiduciary duty must allege the following:

> "(1) the defendant acted negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) the plaintiff suffered injury; and (3) the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries."

Hatch v. Prudential Fin., Inc., Civ. A. No. 05-2050, 2006 WL 3325636, at *4 (M.D. Pa. Nov. 14, 2006) (quoting Schmidt, Long & Assoc. v. Aetna U.S. Healthcare, Inc., Civ. A. No. 00–3683, 2001 WL 856946, at *9 (E.D. Pa. July 26, 2001)). The Complaint specifically alleges that FCS

placed Delia on a Behavior Plan that was not a typical Behavior Intervention Plan prepared for children receiving special education services. (Id. ¶ 83.) Rather, the Behavior Plan prepared by Delia was a code of conduct that specified penalties for various levels of disciplinary infraction. (Id., Attach. D.) The Behavior Plan wasn't "based on a model that applied generally at FCS, but rather was designed solely for Delia," with the goal of causing Delia to fail and be expelled from FCS. (Id. ¶ 85.) On October 31, 2017, the same day that the Does were presented with the Behavior Plan, Mrs. Doe learned from Dr. Romano that Principal Bird called Dr. Romano on October 31, 2017 "to ask her **if Delia could be searched for weapons** when entering the School grounds." (Id. ¶ 86.) Principal Bird also suggested to Mrs. Doe in late October 2017 that the Does remove Delia from FCS immediately, "while Mrs. Doe could still collect favorable letters of recommendation[] from Delia's teachers that would be useful in applying to other schools." (Id. ¶ 108.)

The Complaint further alleges that, shortly after Mrs. K sent an email to Defendant Bird stating that her daughter should never be seated next to Delia, never be alone with Delia, and never berequired to do a group project with Delia (id. ¶ 111, Attach. C), FCS imposed new rules for Delia that isolated her from her classmates by (1) requiring her to walk at the front of any line of students so that she could be closely monitored; (2) requiring Delia to be supervised by a teacher at all times during recess; and (3) requiring Delia to spend her lunch period with the school counselor (id. ¶ 112). The Complaint also alleges that Defendants Bird, Acinapura and Sellars imposed these restrictions on Delia because of Mrs. K.'s email and that Bird responded to Mrs. K.'s email by informing her, in reference to these restrictions, that the School had implemented "a proactive and specific plan." (Id. Attach. C at 3.) The Complaint further alleges that virtually all of the measures adopted by FCS to address Delia's threat to the safety of others, including the one-

on-one aide, "**were conceived by and foisted on the School by**, Mr. and Mrs. K" and the other

fifth-grade parents. (Id. ¶ 135.) Additionally, the Complaint alleges that, by imposing these

restrictions on Delia at the behest of other fifth-grade parents, Defendants Bird and Sellars "ceded

control over Delia'[s] education and general experience at the School to the fifth-grade parents

and, in particular, to those parents who were significant contributors to the FSC fisc [sic]." (Id. ¶

120.)

We conclude that the Complaint plausibly alleges that Defendants Bird, Acinapura, and

Sellars either negligently or intentionally failed to act in good faith and solely for Delia's benefit

when they imposed restrictions on Delia's activities and classroom participation through the

imposition of the Behavioral Plan, the restrictions on Delia's movement in the School, and the

one-on-one aid; that Delia suffered injuries as a result; and that the individual Defendants took

these actions as a result of complaints from the other fifth-grade parents, rather than for Delia's

sole benefit. We further conclude, accordingly, that the Complaint alleges a facially plausible

claim for breach of fiduciary duty under Pennsylvania law. See Hatch, 2006 WL 3325636, at *4

(quotation omitted). Accordingly, we deny the Motion to Dismiss as to Count VII.

## IV.      CONCLUSION

For the foregoing reasons, we grant the Motion to Dismiss as to Counts I and II of the

Complaint and deny it as to Counts III through VII. An appropriate Order follows.


BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.